McCOY-GARTEN REALTY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 13675.   Promulgated December 20, 1928.

*Albert H. Winter, C. P. A.*, for the petitioner.
*James A. O'Callaghan, Esq.*, for the respondent.

OPINION.

SIEFKIN: The first question for consideration is whether the amounts paid to holders of the preferred stock were, in fact, dividends or were interest on borrowed money. This requires a consideration of all of the circumstances surrounding the transaction. What the parties called the instruments is persuasive but not conclusive. See *Arthur R. Jones Syndicate* v. *Commissioner of Internal Revenue*, 23 Fed. (2d) 833; *Leasehold Realty Co.*, 3 B. T. A. 1129; *Bolinger-Franklin Lumber Co.*, 7 B. T. A. 402. The petitioner, in support of its contention that the payments made constituted interest and in support of its position that it should be allowed certain deductions for amortization of bonded account, calls attention to the fact that by the terms of the contract of May 14, 1920, between McCoy and Garten as individuals, on the one hand, and the financial agents, on the other, the so-called dividends were paid irrespective of earnings. It is also pointed out that the corporation agreed not to encumber its property or incur indebtedness over $2,000; that the stock provides specific dividends on specific dates, and also provides specific dates for retirement of the principal; that the corporation pledged its assets toward the payment of the preferred stock and that McCoy and Garten further personally guaranteed payment. It is also said that the common stockholders knew that the earnings of the company would not be sufficient to meet the dividends and retirement of the preferred stock before the company was organized.

On the other hand, the respondent points to the certificates of preferred stock themselves and to the contract of May 14, 1920, as evidencing the intent of the parties to issue stock rather than make a loan.

In our opinion there is nothing in the written instruments evidencing the acts of the parties inconsistent with the holding that preferred stock was issued and that the holders of such preferred stock had claims against the assets of the corporation which were subordinate to those of creditors. The provision of the contract prohibiting encumbrances of the property above $2,000 is more easily interpreted as protection to preferred stockholders than, as suggested by the petitioner, as showing that the preferred stockholders were, in fact, creditors. As we view the transaction, the individuals, McCoy and Garten, wanted to raise the money for a building. They did not care how it was raised, but left it to the financial agents. The plan, as adopted, raised the money by the issuance of preferred stock calling for dividends on and retirement of such stock, performance being guaranteed by McCoy and Garten as individuals. The provisions of the contract, in our opinion, are not inconsistent

with the holding that the relation of the parties was what they said it was in their written instruments.

We believe the situation is materially different from that considered in *Arthur R. Jones Syndicate* v. *Commissioner, supra,* in which the Circuit Court of Appeals for the Seventh Circuit held that the relationship of debtor and creditor existed under so-called preferred stock certificates. In that case it was evident that the taxpayer was compelled to execute a document incorrectly describing the relationship of the parties in order to avoid the Illinois usury law. That fact is not present in this proceeding.

What we have said as to the nature of the obligation of the petitioner to the holders of the preferred stock compels a holding that the respondent correctly refused to permit the discount on the sale of the preferred stock to be amortized. This would be so even if the stock had a definite life which it has not because of the option given to retire the stock before December 1, 1926. See *William Cluff Co.,* 7 B. T. A. 662; *Emerson Electric Manufacturing Co.,* 3 B. T. A. 932; *Corning Glass Works,* 9 B. T. A. 771.

*Judgment will be entered for the respondent.*

TRAMMELL, dissenting: The principal question for consideration is whether the amounts which were paid by the petitioner as so-called dividends were in fact dividends on stock or interest paid for the use of borrowed money. Whether these amounts were dividends or interest depends primarily on whether the transaction, which was carried out pursuant to the provisions of the various contracts set forth in the findings of fact, constituted a loan or an investment in preferred stock.

While the formal transaction was between the banking firm of Wild & Co. and the petitioner corporation, a correct solution of the question can be reached only from an examination of all the surrounding facts and circumstances established by the record. In our consideration of the problem we are not confined solely to the provisions of the so-called certificate of preferred stock, nor of the contracts pursuant to which the " preferred stock " was issued. The rule that parol evidence can not be received to contradict or vary a written contract does not apply as against either party in an action between a party to the contract and a third person. *Sigua Iron Co.* v. *Greene,* 88 Fed. 207; *O'Shea* v. *N. Y. C. & St. L. R. Co.,* 105 Fed. 559.

In *Arthur R. Jones Syndicate* v. *Commissioner of Internal Revenue,* 23 Fed. (2d) 833, the Circuit Court of Appeals, Seventh Circuit, had before it the same issue which is presented here, and in its consideration of the question whether the transaction there involved

constituted a loan, only casual reference was made to the provisions of the first preferred stock certificates. The court's conclusion was rested on the evidence " aside from the form of the instrument which the parties adopted to embody their contracts ".

In determining questions of tax liability we have heretofore consistently adhered to the rule that, as against the Government, a taxpayer may be permitted to show, if it be a fact, that what purports to be a certificate of preferred stock is in reality an evidence of indebtedness, or that amounts paid as dividends were in fact interest. *Leasehold Realty Co.*, 3 B. T. A. 1129; *Bolinger-Franklin Lumber Co.*, 7 B. T. A. 402.

Does the evidence here fairly establish that the transaction between Wild & Co. and the petitioner was a loan, notwithstanding that it was in the form of preferred stock? In my opinion it does. The facts show that in the spring of 1920, Henry J. McCoy and Walter C. Garten conceived the idea of constructing a building on certain lots which they owned in the City of Indianapolis. Not having sufficient money for the purpose, they consulted their banker with reference to the matter of financing the construction of the building. In other words, they applied for a loan. The banker consented to furnish the necessary funds on certain terms and conditions, which were thereafter embodied in the contract set out in our findings of fact, above. One of the conditions imposed by the banker was that McCoy and Garten should organize an Indiana corporation to which the *lots* mentioned should be conveyed, and which corporation should issue " preferred stock " in the amount of $160,000, " bearing dividends " at the rate of 7 per cent per annum. When all of the conditions precedent, as specified in the contract, had been complied with, the bank agreed to purchase the so-called preferred stock at 95 per cent of par. Under the terms of the contract, the corporation was bound to redeem $25,000 par value of this so-called preferred stock annually over a period of 5 years beginning December 1, 1921, and the balance of $35,000 on the corresponding date of the sixth year. The corporation was also bound under the contract not to incur indebtedness in excess of $2,000, while any of the so-called preferred stock was outstanding, thus in effect pledging the assets of the corporation as security for payment of the so-called " dividends " and redemption of the so-called preferred stock. In addition, the banker required McCoy and Garten personally to guarantee payment of the so-called " dividends " and to agree to purchase at par any amount of the so-called preferred stock not redeemed by the corporation in accordance with the contract. The so-called preferred stock certificates also provided that if the terms thereof were not complied with the stockholder would have the right to require the immediate liquidation of the corporation and the application of its assets to the payment

of creditors and stockholders in accordance with the provisions of the certificates.

McCoy and Garten did not desire nor originally contemplate the organization of a corporation to construct and operate the proposed building. This was solely a condition imposed by the banker. The record further indicates plainly that the whole scheme, composed of the terms and conditions imposed in the contract, was conceived by the banker for the purpose of better securing the repayment of the money furnished by the bank, together with the so-called dividends and the other items, which amounted in effect only to interest or compensation for the use of the money. Certainly, there is nothing in the record to indicate that the bank purchased or at any time regarded itself as the owner of any interest in the assets and affairs of the corporation beyond the securing of compliance with the contract under which it furnished the money.

A significant circumstance in support of these conclusions is the fact that in 1924, when the remainder of the so-called preferred stock outstanding was redeemed, the corporation was thereupon promptly dissolved. Also, in each year it was necessary for McCoy and Garten to pay out of their own funds, under the terms of their agreement, a substantial portion of the so-called " dividends " or amounts required to redeem the so-called preferred stock. Both in the contract and in the alleged certificate of preferred stock, reference was made to the payment of " dividends." Yet it was known, at the time of the negotiations which lead to the execution of the contract, that the corporation would not have sufficient earnings in 1920, or at any time prior to completion of the building, out of which the required " dividends " could be paid, and that it could not reasonably be expected that the corporation would ever have sufficient earnings to enable it to pay the " dividends " and redeem the so-called preferred stock as required by the contract.

On this point, Garten testified:

\* \* \* When we fixed the retirement of this stock and the amount of interest we had to pay, we knew that the earnings of the building would not pay it and we expected to pay it out of our individual funds.

Q. You were expecting to have to advance money to the company to pay it?
A. Yes.

Q. So that in no year, during the existence of this company, were the earnings sufficient to meet the interest and retirement of the stock as had been agreed?
A. No, sir. \* \* \*

It appears that McCoy and Garten always considered the matter as a loan, and that the so-called " dividends " were consistently treated as interest payments.

I am unable to find anything in the record which convinces me that Wild & Co. invested its money in the building enterprise, or assumed any risk in connection therewith. On the contrary, the evi-

dence indicates that the bank took every precaution to secure the repayment of the money furnished by it, together with compensation for the use of that money.

In *Jones Syndicate* v. *Commissioner*, *supra*, the court in the course of its opinion, said:

All the witnesses who testified before the Board of Tax Appeals described the transaction as a loan and stated that the parties made use of the so-called first preferred stock as a mere expedient to circumvent the force and effect of the usury laws.

There are two primary questions the answers to which are decisive of this appeal: First, does the evidence show the transaction between Austin and the Jones Syndicate to be a loan? Second, should the taxpayer be permitted to assert that Austin was a creditor rather than a certificate holder in the syndicate?

The first question must be answered in the affirmative. Aside from the form of the instrument which the parties adopted to embody their contract, there is no evidence to contradict the asserted relationship of debtor and creditor. * * *

Should the court, as against the government, permit the borrower to disclose what it has in writing disputed in order that it might avoid its tax? This is the second question.

\* \* \* \* \* \* \*

But the better reasoning sustains the view that a borrower whose necessities lead him to the door of the usurer may always show—by evidence aliunde the contract—the real character of the transaction. The very necessities of the borrower who pays a usurious rate of interest make it necessary for courts to admit his oral testimony to dispute his written word. * * * for an additional reason such evidence is admissible against third parties. * * *

We therefore conclude that a taxpayer who borrows money at a usurious rate of interest and who, to conceal the usury, is compelled to execute a document which does not correctly disclose the relationship of the parties, may, as against the government, disclose the true relationship of debtor and creditor. Sums by it paid as interest, regardless of the name by which it is called, may be deducted by the taxpayer from its income.

In the instant case, we are not advised why the bank required McCoy and Garten to enter into the particular contract in question, and imposed the terms and conditions specified as a prerequisite to furnishing the money. Whether it was to avoid the possible effect of a usury statute, or for some reason other than better to secure the repayment of the money, with compensation for its use, the record does not affirmatively show. It does, however, affirmatively appear that the " interest " and other charges, including the discount exceeded the legal rate of interest in Indiana, and it may well be that this was one reason which induced the bank to require the transaction to take this form. However, upon consideration of all the evidence, it is my opinion that the transaction with Wild & Co. constituted a loan, and that the amounts paid as so-called dividends were in fact interest, which may be deducted by the petitioner from its income.