CLUETT, PEABODY & CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 112444.   Promulgated January 31, 1944.

*Norris Darrell, Esq.*, for the petitioner.
*Harold D. Thomas, Esq.*, for the respondent.

**OPINION.**

STERNHAGEN, *Judge*: The excess ($206,369.57) over cost ($56.607.05) received by the taxpayer corporation for 12,303 shares among the 112,974 shares disposed of by it in 1937 to subscribing shareholders is treated by the Commissioner as taxable gain, and this the taxpayer challenges as contrary to Regulations 94. article 22 (a)–16. Both parties recognize that this article of the regulations is controlling. Cf. *Helvering* v. *Reynolds Tobacco Co.*, 306 U S. 110; *Commissioner* v. *Air Reduction Co.*, 130 Fed. (2d) 145; *Dr. Pepper Bottling Co. of Miss.*, 1 T. C. 80. The question for decision is therefore confined to whether the "real nature of the transaction" disposing of the 12,303 shares, "under all the facts and circumstances," was a dealing by the corporation in its own shares "as it might in the shares of another corporation." *Pittsburgh Laundry, Inc.*, 47 B. T. A. 230. 233.

Except for the fact that the corporation disposed of the shares for money, there is no similarity between this disposition and a sale of shares of another corporation. The corporation was not "dealing" in its own shares. Neither the acquisition of the shares nor their disposition, although both were under different circumstances and with different motives and under different plans, could or would have been considered or carried out in the shares of another corporation. Profit was not behind the impulse to acquire these shares in the first place or behind the later impulse to distribute them to shareholders. The first was a step in a profit-sharing plan for employees, whereby the employees might acquire or enlarge their proprietor interest in the business. This could not have been achieved by acquiring the shares of another corporation. The profit-sharing plan was inoperative only because the necessary earnings upon which it was conditioned had not been realized. The disposition in 1937 was likewise not actuated by a motive to sell at a profit, but by the new general plan

to restate the corporation's capital and issue more shares as a method of procuring additional funds for capital purposes.

The accounting for both these transactions manifests this absence of a profit motive as an explanation of the transactions. The shares were not carried as an asset. The cost was kept in the treasury stock account and the excess received from the shareholders' subscriptions allocable to 12,303 shares was assigned to the capital and the capital surplus accounts, none of the proceeds being accounted for as earnings or profits or posted to the earned surplus account. If, however, the corporation had been dealing in the shares of another corporation, they would have been carried as an asset, the acquisition in the first place could not have appeared in the treasury stock account, and the proceeds of sale, whether to its shareholders. employees, or to outsiders, would have been credited to earnings and profits and posted to earned surplus. These bookkeeping matters are, of course, not controlling as to the legal or real nature of the transaction, but they are not without significance in considering whether the corporation was dealing in its own shares as it might in the shares of another corporation.

The disposition of these shares may not be treated as if it were a separate and isolated transaction whereby 12,303 treasury shares were sold for cash. The regulations say that the characterization for tax purposes depends upon the real nature of the transaction. The real nature of this transaction in so far as it relates to these 12,303 shares is that it was an incident of the adjustment of the corporation's capital stock as a means of getting new funds needed for capital purposes. Nothing in the record indicates that the 12,303 shares were being dealt with by themselves or that they would have been dealt with as a disposition of treasury shares if there had been no program of recapitalization. It was but part of a method of getting larger investments from the shareholders, after which the further capital needs were to be procured by selling additional new shares to bankers. To say that the whole refinancing is to be regarded as a means of selling these treasury shares at a profit and escaping tax upon the gain is to misplace the emphasis. The corporation might, to be sure, have accomplished its refinancing purpose without using these treasury shares, and if it had done so, the present controversy would not have arisen; but it seems to us unreasonable to say that the disposition of the treasury shares was a cleverly devised means of realizing a gain and avoiding tax upon it. The reference in the May 11, 1937, letter to the undistributed profits tax has no more significance here than in the *Dr. Pepper* case. It simply meant that since the corporation could not avoid the undistributed profits tax by using its existing earned surplus for plant and equipment it might better procure its new working capital by the method of issuing new shares. This rationale does not

affect the characterization of the disposition of the 12,303 treasury shares as a step in that method.

The real nature of the disposition of all the 112,974 shares was a means to procure additional capital, and in this the use of the treasury shares was a part. We hold that the corporation thereby realized no gain, and that the Commissioner's determination was incorrect.

The facts and circumstances in the present case lead as directly to the conclusion that this was not a realization of gain as did those in the *Dr. Pepper Bottling* case, where the Commissioner's determination of gain was reversed. The purpose of the purchase of the corporation's shares, in that case, was a redistribution of shares among the shareholders; here it was a plan for profit sharing among the officers and employees. The purpose of the sale, in that case, of the treasury shares although it was a departure from the original purpose was a readjustment of capital, and the undistributed profits tax threatened if the earnings were used for capital purposes instead of being distributed; the same is true in the present case. In both cases, the threefold criterion of the real nature of the transaction is present. See also *Brockman Oil Well Cementing Co.*, 2 T. C. 168. The cases of *Helvering* v. *Edison Bros. Stores, Inc.*, 133 Fed. (2d) 575; *Brown Shoe Co.* v. *Commissioner*, 133 Fed. (2d) 582; *Commissioner* v. *Air Reduction Co.*, 130 Fed. (2d) 145, and *Dow Chemical Co.* v. *Kavanagh*, 139 Fed. (2d) 242, are all cases where the sale of the corporation's treasury shares was merely a sale, albeit, in the three earlier cases to employees, and there were no circumstances which gave it a character or effect different from a sale of the shares of another corporation. In none of them were the circumstances such as to establish that the sale was not a mere sale but was instead an element in the readjustment of the corporation's capital.

The taxpayer, as a precautionary second point, pleaded the deductibility of a payment of transfer agent's fees of $5.046.77, but concedes that if it is successful in overcoming the determination as to the $206,-369.57 such a deduction is not available to it.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

OPPER, *J.*, dissenting: If we were free to follow our own judgment on this subject, I should be more inclined to accept the Court's disposition of the present proceeding. But it seems to me the prevailing opinion can not be reconciled with the principle established by the decisions of the five Circuits which have now considered the question; and I do not think we are at liberty to disregard those decisions. See *Commissioner* v. *Woods Machine Co.* (C. C. A., 1st Cir.), 57 Fed. (2d) 635; certiorari denied, 287 U. S. 613; *Allen* v. *National Manufacture*

& *Stores Corporation* (C. C. A., 5th Cir.), 125 Fed. (2d) 239; certiorari denied, 316 U. S. 679.

Had petitioner adhered to its original program, no taxable income would have resulted, and the present question would not have arisen. But that would have been the effect of the provisions of the plan which made it impossible for petitioner to realize any gain, since the stock was to be distributed at or below cost. It would not have followed from the character of the transaction. If the original program had been changed merely to the extent of permitting distributions to employees at a profit, instead of at cost, the result would have fallen squarely within the decisions of the Second and Eighth Circuits in *Commissioner* v. *Air Reduction Co.*, 130 Fed. (2d) 145, and *Brown Shoe Co.* v. *Commissioner*, and *Helvering* v. *Edison Brothers Stores, Inc.*, 133 Fed. (2d) 582 and 575, respectively. Certainly, the mere purpose of employee stock participation does not mark the operation as an adjustment of capital. Cf. Judge Learned Hand's dissent in *Commissioner* v. *Air Reduction Co.* The further change culminating in the sale of the stock, not only at a profit but to different distributees, makes the petitioner's case even weaker and brings it within the recent decision of the Sixth Circuit in *Dow Chemical Co.* v. *Kavanagh*, 139 Fed. (2d) 242, where, also, the ultimate sale took place because the taxpayer "found itself in need of additional capital to finance an expansion program."

The situation is only superficially like that in *Dr. Pepper Bottling Co. of Mississippi*, 1 T. C. 80. The adjustment of capital which the petitioner there accomplished by the original purchase of its stock was completed according to plan. It was not subsequently changed, and it did not contemplate an ultimate disposition as did the original plan of this petitioner. We were able to say in that case that there was "no inference that it was significant whether the stock was retained in the corporation's treasury or definitively retired." Here the stock would never be retired while the original plan persisted; and when that plan was abandoned in mid-course because petitioner needed cash, it was transmuted into one for handling the same shares in a manner comparable to any other property or to those of any other corporation—one which readily could and actually did result in unmistakable profit.

Petitioner was not compelled by the terms of its employee participation plan to acquire the stock in the first place, for, unlike the situation in the *Brown Shoe Co.* case, for example, it could have discharged the obligation to its employees by the payment of cash. Thus, its purchase must have been due, it seems to me, like that in *Dow Chemical Co.* v. *Kavanaugh*, to the fact that petitioner "having idle funds not needed in its operations, and knowing the value of its own stock,

did what any other prudent investor would have done—bought it when its price was low."

I conclude, at least under the now outstanding decisions, that when a corporation buys its stock with a view to future distribution and, in fact, engages in that future distribution at a profit, whether originally so designed or not, it has dealt in its stock as it would in other property and has subjected itself to tax. I respectfully dissent.

HILL, *J.*, agrees with this dissent.