**ANDERSON, CLAYTON & CO.**

v.

**UNITED STATES.**

**No. 626-52.**

United States Court of Claims.

July 13, 1954.

John C. White, Washington, D. C., for plaintiff.

John A. Rees, Washington, D. C., with whom was H. Brian Holland, Asst. Atty. Gen., for defendant. Andrew D. Sharpe and Lee A. Jackson, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

Plaintiff sues to recover $100,571.25 with interest thereon as provided by law. The principal sum represents the income tax assessed by the Commissioner of Internal Revenue and paid by plaintiff on the $402,285 difference between the amount at which plaintiff purchased 6,500 shares of its capital stock from a deceased official in 1939 and the amount at which it sold and reissued the stock to other officials during its fiscal year ending July 31, 1944. Plaintiff takes the position that no taxable long term capital gain resulted from the transaction because plaintiff was not dealing in the stock as it might have in the shares of another corporation, and that under the provisions of section 22 (a) of the Internal Revenue Code, 26 U. S.C.A., and section 29.22(a)–15 of Treasury Regulation 111, all the facts and circumstances surrounding the transaction show that no taxable gain arose to plaintiff.

Defendant contends that Regulation 111, section 29.22(a)–15 does not entitle plaintiff to recover as that regulation has been construed by the Circuit Courts of Appeal for several circuits on facts sufficiently similar to the facts in this case to be persuasive.

Section 22(a) of the Code provides:

"General definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *"

Regulation 111, section 29.22(a)–15 provides:

"*Acquisition or disposition by a corporation of its own capital stock.* —Whether the acquisition or disposition by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss

depends upon the real nature of the transaction, which is to be ascertained from all its facts and circumstances. The receipt by a corporation of the subscription price of shares of its capital stock upon their original issuance gives rise to neither taxable gain nor deductible loss, whether the subscription or issue price be in excess of, or less than, the par or stated value of such stock.

"But if a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another. So also if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property. Any gain derived from such transactions is subject to tax, and any loss sustained is allowable as a deduction where permitted by the provisions of the Internal Revenue Code."

The facts as stipulated by the parties may be summarized as follows: Plaintiff was organized in 1929 as a cotton merchandising business with a capitalization of $25,842,375 of first preferred stock and $53,312.50 of common stock. In 1930 an additional 46,687½ shares of common stock were sold at $1 per share, making the total common stock outstanding 100,000 shares. The capital value of the no par value common stock was fixed at a stated value of $1 per share and was sold at that price to the managing officials of the corporation. No preemptive rights existed as to the common stock.

Because of the complex nature of the cotton merchandising business and the essentiality of long experience for its top executives in all phases of the business, it was decided to use the common stock of the corporation as a means to attract, retain, and incite incentive in such top officials. In 1931 a written agreement was entered into between the corporation and the various company officials who owned all the common stock whereby each of the owners endorsed his stock to Monroe D. Anderson as trustee for a period of 10 years, which period was subsequently extended, with the stockholders retaining the right to vote the stock and receive dividends thereon. The agreement provided that the stockholders would not assign, transfer, or otherwise dispose of their stock without the written consent of the holders of 75 percent of the stock; that on the death of any party to the agreement the corporation would purchase the stock of the deceased person at the special book value determined as of July 31 immediately preceding the death according to the provisions contained in the agreement relative to the annual determination of value by the executive committee of the corporation, but in no event less than $1 per share, plus 6 percent interest from such date to the date of death. The value of the trusteed stock was to be determined annually from a supplementary balance sheet which had been adjusted to show appreciation and depreciation of the value of properties held by the corporation and its subsidiaries to reflect its true net worth. The owners of 75 percent of the stock could request any party to the agreement to sell all or part of his stock to the corporation or to such person as the owners of the 75 percent might designate, either upon terms agreeable to seller and buyer or in the absence of such agreement, at the value fixed for the stock in the annual supplementary balance sheet. Any owner of the stock could sell his stock to the corporation at any time upon the same terms. Any common stock purchased by the corporation under the agreement could be sold to the remaining parties or to any other person whom the owners of 75 percent of the remaining stock might designate. A more complete summary of the agreement is set forth in finding 6.

As junior officials in the corporation assumed more responsibilities, W. L. Clayton, and M. D. Anderson who at first had owned the bulk of the trusteed stock, transferred shares of their stock to such junior officials in accordance with the provisions of the agreement. At Mr. M. D. Anderson's death in 1939, he held only 18,574 shares of the 31,000 originally issued to him. All transfers of the stock were made to persons occupying positions of managerial responsibility in the business and at the values determined under the agreement.

Upon the death of Mr. Anderson, the plaintiff corporation purchased his 18,-574 shares at the contract value of July 31, 1938, which with interest, amounted to $50.79 a share or a total of $943,373.-46. The cost over the $1 stated value of 15,539 of the shares was charged to the Surplus Allocated to Common Stock account. The remaining 3,035 shares of this particular stock were sold to another company official in accordance with the agreement, based on the July 31, 1939, contract value of $32.27 a share and the net "loss" of $18.52 a share or $56,208.20 was charged directly to the Surplus Allocated to Common Stock account. This stock was not retired but was held as treasury stock. While in the treasury no dividends could be paid on it and it could not be voted. Also 1,000 of these shares were sold in 1941 at $33.62 a share and the $32,620 over stated value was credited to the Surplus Allocated to Common Stock account reflecting a "loss" of $17,170 on these shares. Although the corporation sold some of these shares for less than it had paid the deceased official's estate for them, this amount was not deducted from income but was reflected in Surplus as above stated, which resulted only in a smaller Surplus Allocated to Common Stock, maintaining the equity for all common stockholders equivalent to that existing before the sales.

In December 1943, the corporation and its stockholders decided to sell 6,500 shares of the Anderson Estate stock to five of the corporation's junior officials at $112.68 a share, which was the July 31, 1943, supplementary balance sheet value less a $10 dividend payable to the old common-stockholders. The amount over the $1 stated value was credited to the Capital Surplus account (plaintiff relabeled and consolidated some of its surplus accounts) and no income was reported. It is the difference, $402,285, between the amount paid the Anderson Estate in 1939 for the stock and the price at which the stock was transferred to the junior managing officials during the fiscal year ending July 31, 1944, that the Commissioner of Internal Revenue determined to be a taxable long-term capital gain. Timely claim for refund was made, and denied.

Plaintiff points out that under its certificate of incorporation and the trust agreement between itself and its common-stock holders, the transaction in question amounted in substance to the payment to the deceased stockholder of his capital contribution plus his share of undistributed earnings, and in the case of the sale to the new officials, to the equalization of their capital investment with that of the other common-stock holders as represented by the outstanding shares before the sale. Plaintiff contends that when the real nature of the transaction is considered it certainly was not dealing in its own shares as it might in the shares of another corporation and that if the first and third sentences of the Regulation mean anything, they must have been intended to exclude from taxation any gain resulting therefrom.

Prior to 1934 the law on taxable gain or loss on the acquisition and sale of a corporation's own stock was relatively clear. The Commissioner's regulations provided that no gain or loss was realized from a corporation purchasing or selling its own stock.[1] This rule was reasonable, logical and in accord with

---

1. U.S.Treas.Reg. 45, Art. 542 (1918 Act); U.S.Treas.Reg. 62, Art. 543 (1921 Act); U.S.Treas.Reg. 65, Art. 543 (1924 Act); U.S.Treas.Reg. 69, Art. 543 (1926 Act); U.S.Treas.Reg. 74, Art. 66 (1928 Act); U.S.Treas.Reg. 77, Art. 66 (1932 Act).

the accountant's view.[2] The First Circuit in 1932, in its opinion in Commissioner of Internal Revenue v. S. A. Woods Machine Co., 1 Cir., 57 F.2d 635, laid the groundwork for the Commissioner to make a complete about-face insofar as the taxation of treasury stock was concerned. On May 2, 1934, T.D. 4430 [XIII–1 C.B. 36] was promulgated amending the regulations to provide, with certain exceptions not here material, as they do today. Although the retroactive application of the part pertinent herein of the regulation was held invalid by the Supreme Court, the Court did not decide whether its prospective application would be valid. Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536. The validity of this regulation has been specifically sustained or assumed to be valid by the Circuit Courts[3] and this court[4] although apparently no real distinction can be made between the sale of unissued stock, which is unquestionably a capital transaction resulting in the realization of no income or loss, and the sale of treasury stock. Treasury stock is not subjected to as high a stamp tax, is nonassessable, and is free from preemptive rights and sales price restrictions. It may be noted in this respect that the common stock of plaintiff corporation was no-par-value stock and carried no preemptive rights on original issue. None of these distinctions appear relevant in determining whether the sale of treasury stock is a capital transaction. Insofar as the corporation is concerned the sale of unissued stock and the sale of treasury stock each involve a contribution of capital by the stockholder to the corporation with the corporation incurring the same obligation and duties to the stockholder, and the purchase of the stock for retirement and resale each involve a repayment of capital to the stockholder by the corporation. Cf. E. R. Squibb & Sons v. Helvering, 2 Cir., 98 F.2d 69. Also, treasury stock, like unissued stock, does not have an intrinsic value, but merely represents the power and right to issue additional stock. While in the treasury this stock earns nothing for the corporation, dividends are not paid on it, nor does it carry voting or any of the other rights incident to outstanding stock. It would be a courageous step to hold that a corporation can never realize income on the sale of treasury stock because it is a capital transaction. We do not find it necessary to consider whether this step should be taken because the plaintiff is entitled to recover under the plain terms of the regulation as we construe it.

2. Paton, Accountant's Handbook (3rd ed.), pp. 1006–1014; Report of the Committee on Accounting Procedure (American Institute of Accountants 62 J. Accountancy 417 (1938); Security and Exchange Commission Accounting Series, Release No. 6 (1938).

3. Allen v. National Manufacture & Stores Corp., 5 Cir., 125 F.2d 239, certiorari denied, 316 U.S. 679, 62 S.Ct. 1106, 86 L. Ed. 1753; Aviation Capital v. Pedrick, 2 Cir., 148 F.2d 165, certiorari denied, 326 U.S. 723, 66 S.Ct. 28, 90 L.Ed. 428; Brown Shoe Co. v. Commissioner, 8 Cir., 133 F.2d 582; Commissioner of Internal Revenue v. Air Reduction Co., 2 Cir., 130 F.2d 145, certiorari denied, 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546; Commissioner of Internal Revenue v. Batten, Barton, Durstine & Osborn, Inc., 2 Cir., 171 F.2d 474, certiorari denied 338 U.S. 816, 70 S.Ct. 56, 94 L.Ed. 494; Commissioner of Internal Revenue v. Landers Corp., 6 Cir., 210 F.2d 188; Commissioner of Internal Revenue v. H. W. Porter & Co., 3 Cir., 187 F.2d 939; Commissioner of Internal Revenue v. Rollins Burdick Hunter Co., 7 Cir., 174 F.2d 698; Dow Chemical Co. v. Kavanagh, 6 Cir., 139 F.2d 42; Helvering v. Edison Bros. Stores, 8 Cir., 133 F.2d 575, certiorari denied, 319 U.S. 752, 69 S.Ct. 1166, 87 L. Ed. 1706; United States v. Stern Bros. & Co., 8 Cir., 136 F.2d 488. Judge Frank, in a concurring opinion in Commissioner v. Batten, Barton, Durstine & Osborn, Inc., supra, after stating that it was irrational to ever consider treasury stock as a capital asset said: "The situation, then, to my mind, is like that in a farce: An untenable premise, once adopted, is to be carried out logically." [171 F.2d 477.]

4. Wiegand Co. v. United States, 60 F. Supp. 464, 104 Ct.Cl. 111.

The Commissioner's position that income may be realized by a corporation on the sale of treasury stock may be justified on the ground that as a practical matter some corporations do deal in their own stock just as though it were an asset, buying it, holding it as an investment, and selling it at opportune times. That is the type of situation that we believe the portion of the regulation here in question covers.

■ The Tax Court, notwithstanding reversals, has for a number of years uniformly applied this regulation literally and examined the real nature of the transaction considering all the facts and circumstances in determining whether or not the transaction resulted in a taxable gain. The Tax Court maintains the position that if a corporation buys and sells its own shares for the purpose of satisfying contractual obligations, equalizing shareholdings, eliminating a participant wishing to retire, implementing an employee profit sharing plan, or keeping the ownership of the corporation within a particular group, the corporation is not dealing in its own shares as it would in another corporation because the treasury shares are not treated as assets and are not bought and sold for the purpose of making a profit, and accordingly holds that no taxable gain or loss is realized.[5]

The Circuit Courts of Appeal have, with equal uniformity, with some judges dissenting, adopted the position that unless the corporation repurchasing its own stock legally retires it according to State law and issues new stock, the transaction results in taxable gain or loss to the corporation.[6]

We agree with the Tax Court's position because: (1) we entertain some doubt as to whether a corporation's purchasing and selling its own stock is not really a capital transaction, (2) the basis for the Circuit Courts' decisions is one of form only in that it rests entirely on the failure of the corporation to go through the formal mechanics of actually retiring the stock and issuing new stock, and (3) the plain terms of the regulation support the Tax Court's position. When the regulation is viewed in this light, plaintiff falls comfortably within the language and purview of the regulation. The plaintiff did not purchase the stock at opportune times. It was obligated by contract to repurchase the stock when a stockholder died, at a price equal to the book value of the stock as determined from a supplementary balance sheet reflecting the true net worth of the corporation. This is how the stock in question was purchased by the corporation. The corporation was also obligated to purchase the stock of any common-stock holder who left the corporation, or for any reason withdrew from the agreement, at a negotiated price or in the event of their inability to agree, at the price determined similar to that of a deceased stockholder. The time of sale was clearly not dictated by profit on the sale of the stock. As a matter of fact some of the stock was sold at a "loss," and the approval of 75 percent of the common-stock holders was required for these transactions. The provisions of the certificate of incorporation and the trust agreement were designed to attract, retain, and incite incentive in competent officials, which were a necessity because of the complex nature of its business. The common stock was trusteed under conditions that assured its receipt and retention by only active management and its redistribution according to changing managerial responsibility.

■ Pursuant to its certificate of incorporation and the trust agreement, plaintiff purchased Mr. M. D. Anderson's 18,574 shares at his death in 1939, for the contract value of $50.79 a share.

5. Dr. Pepper Bottling Co. of Miss., 1 T.C. 80; Brockman Oil Well Cementing Co., 2 T.C. 168; Cluett, Peabody & Co., Inc., 3 T.C. 169; Rolling Burdick Hunter Co., 9 T.C. 169, reversed, 7 Cir., 174 F.2d 698; Batten, Barton, Durstine & Osborn, Inc., 9 T.C. 448, reversed, 2 Cir., 171 F.2d 474; H. W. Porter & Co., 14 T.C. 307, reversed, 3 Cir., 187 F.2d 939; The Landers Corp., 11 T.C.M. 577, reversed, 6 Cir., 210 F.2d 188; Timken-Detroit Axle Co., 21 T.C. 769.

6. See footnote 3.

In 1943, in accordance with plaintiff's policy, it sold 6,500 of these shares to junior officials of the corporation for $112.68 a share, which was the contract value less a $10 dividend payable to the old common-stock holders. This differential, which the Commissioner claims should be taxed, represents largely, if not entirely, accumulated earnings of the corporation which have already been subjected to tax. The respective purchases and sales of this common stock amounted in substance (1) in the case of purchases by the corporation, to the withdrawal by the stockholder of his capital contribution plus his undistributed earnings accumulated during the period of his ownership of such stock, and (2) in the case of sales by the corporation to new managers, to a contribution of capital in an amount equal to the existing stockholder's contributed capital plus accumulated undistributed earnings so as to equalize the equity of all common-stock holders and the distributions thereafter during the ownership of such stock by the executive permitted to buy it. On these facts it is rather difficult to comprehend how plaintiff corporation realized an accession to income. Upon examining the real nature of the transaction, considering all the facts and circumstances, we arrive at the conclusion that plaintiff was not dealing in its own shares as it might in the shares of another corporation.

The Wiegand Co. v. United States, 60 F.Supp. 464, 104 Ct.Cl. 111, upon which defendant relies, is distinguishable on its facts.

Notwithstanding the uniformity of the decisions of the Circuit Courts on this issue, we are unable to agree with them. To say that there is a taxable gain merely because there is a difference between the purchase and sales price is really to assume the question in issue. There also can be a difference in the cost of stock retired and the price at which new stock is issued, but the resulting difference is not taxable or deductible because it is a capital transaction. Consequently, the question that confronts the court in these cases, assuming the regulation to be valid, is whether the treasury stock was treated in substance as an asset rather than stock of the corporation. To do this requires an examination of all the facts and circumstances of the case. Although the Circuit Courts' view, considering the one factor of failing to actually retire the stock as controlling, is an expeditious method of determining taxability of treasury stock, it must be conceded that this distinction between treasury stock and unissued stock is one of form. Moreover, it would be equally expeditious to hold that the acquisition and sale of a corporation's own stock was a capital transaction, since it does as a practical matter result in readjustment of capital and find support in the famous case of Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521. We therefore conclude that plaintiff is entitled to recover $100,571.25 plus interest allowed by law.

It is so ordered.

JONES, C. J., and MADDEN and WHITAKER, JJ., concur.

LARAMORE, J., took no part in the consideration or decision of this case.