## DUNCAN INDUSTRIES, INC. (SUCCESSOR IN INTEREST TO MARBLCAST, INC.), PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6412–77.     Filed November 15, 1979.

Andrew J. Duncan, Jr. (an officer), for the petitioner.
*John W. Harris,* for the respondent.

DRENNEN, *Judge:* Respondent has determined the following deficiencies in petitioner's corporate income tax:

| FYE Mar. 31— | Deficiency |
| --- | --- |
| 1973 ...................... | $1,858 |
| 1974 ...................... | 7,287 |

The following issues[1] are presented for our resolution:

(1) Whether petitioner sold discounted stock in connection with a certain loan agreement;

(2) If the stock was in fact discounted, does section 1032, I.R.C. 1954,[2] bar a deduction under section 162;

(3) Whether petitioner must show its compliance with the terms of section 83(h) in order to claim a deduction in connection with this transaction.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by reference.

Petitioner, an Ohio corporation, maintained its principal place of business in Montecito, Calif. Petitioner filed a timely U.S. Corporation Income Tax return for the fiscal year ending March 31, 1973, with the District Director of the Internal Revenue Service at Cincinnati, Ohio. Petitioner filed its U.S. Corporation Income Tax return for the fiscal year ending March 31, 1974, on September 17, 1974. It also filed an amended return for this year on December 16, 1974. Both these returns were filed with the District Director of the Internal Revenue Service at Cincinnati, Ohio.

The petitioner's predecessor in interest, Marblcast, Inc. (Marblcast), was formed on February 18, 1969, under the laws of the State of Georgia, and began the manufacture of marble products. The authorized capital stock of the corporation was 1

---

[1]Due to a concession by petitioner on an issue involving depreciation on a certain building, decision under Rule 155, Tax Court Rules of Practice and Procedure, will be necessary if petitioner ultimately prevails.

[2]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years at issue, unless otherwise specified.

million shares of $1 par value stock. At that time, Andrew J. Duncan, Jr. (Duncan), was its sole shareholder and president.[3] In its first year of operation, Marblcast incurred an operating loss of approximately $40,000.

Dycap, Inc. (Dycap), is a small business investment company (SBIC). Dycap, as are all SBICs, is licensed under the Small Business Investment Act of 1958. It is a privately owned and capitalized company and engages in the business of making high-risk loans to new or financially unsettled corporations. Dycap is regulated by the Small Business Administration (SBA) and is subject to annual examination by the SBA to determine if its regulations are being properly followed.

When Dycap determines to make a loan, it typically borrows funds from the SBA. The SBA will loan Dycap $3 for every dollar of privately invested capital it raises and will charge a 7⅜-percent rate of interest on the money loaned. Dycap then loans the funds to other companies at a mutually agreeable rate of interest. However, pursuant to SBA regulations, it may not lend money with an interest rate in excess of 15 percent.

Because of this interest limitation and the usually small spread between the interest paid to the SBA and the interest received from its debtor companies, Dycap usually purchased an equity interest in the companies to which it was lending money. Dycap obtained these interests in one of two ways, either by purchasing the stock outright, or by purchasing call options with the striking price set at the time of the making of the loan. Outside of the 15-percent-a-year limit on the amount charged on the outstanding principal, the SBA placed no restrictions on Dycap on the amount of consideration paid for these equity positions, nor did it limit fees charged for obtaining a loan.

During 1969, Ballinger, Inc. (Ballinger), an Ohio corporation and a competitor of Marblcast, obtained a loan from Dycap. Incident thereto, Dycap purchased 100 shares of Ballinger preferred stock. This loan was repaid with the life insurance proceeds obtained as a result of the death of Mr. Ballinger, president of Ballinger.

In December 1969, it came to Duncan's attention that Ballinger might be for sale. Ballinger was a relatively new

---

[3]Duncan originally paid $10,000 for 10,000 shares of the stock. Subsequently, he converted a $60,000 loan to Marblcast into 60,000 shares of stock.

company and had a negative net worth since its inception. Marblcast was in need of additional sales accounts. Duncan believed that a purchase of Ballinger, with its existing sales accounts, would be financially expedient and at that time contacted A. Gordon Imhoff (Imhoff), who had been running Ballinger during the period following Mr. Ballinger's death. Imhoff was also a director and general manager of Dycap. Additionally, Imhoff handled all of Dycap's portfolio investments.

Duncan was unable to secure financing from conventional lenders with which to complete the purchase of Ballinger. Since without financing there could be no purchase, he then contacted Imhoff about the possibility of obtaining a loan from Dycap. Marblcast supplied Imhoff with information regarding its financial status, history, and makeup of management; additionally, Imhoff requested and was supplied information regarding Duncan's background. Among the documents Imhoff reviewed incident to this loan request was Marblcast's unaudited balance sheet for the period ending December 31, 1969 (Exhibit 14–N), which was as follows: [4]

---

[4] While it is not clear whether Imhoff received it, there is attached to Exhibit 14–N a proforma balance sheet for Marblcast, Inc., as of Mar. 31, 1970, which is as follows:

MARCH 31, 1970

ASSETS

*Current assets:*

| | | |
|---|---:|---:|
| Cash | | $5,713 |
| Accounts receivable | | 65,433 |
| Inventories: | | |
| Finished goods | $8,382 | |
| Materials | 13,750 | 22,132 |
| Prepaid expenses | | 69 |
| Total current assets | | 93,347 |

*Fixed assets:*

| | | |
|---|---:|---:|
| Machinery and equipment | 61,864 | |
| Furniture and fixtures | 2,317 | |
| Automobile and trailer | 4,887 | |
| Leasehold improvements | 2,937 | |
| | 72,005 | |
| Less: accumulated depreciation | 8,193 | 63,812 |

*Other assets:*

| | | |
|---|---:|---:|
| Unamortized pre-production charges | 2,772 | |
| Unamortized organization expense | 857 | |
| Deposits | 575 | 4,204 |
| | | 161,363 |

## DECEMBER 31, 1969

### ASSETS

*Current assets:*

| | |
|---|---:|
| Cash | $25 |
| Accounts receivable—trade | 43,533 |
| Employee advances | 50 |
| Inventories | 19,600 |
| Prepaid expenses | 4,240 |
| Total current assets | 67,448 |

*Fixed assets:*

| | | |
|---|---:|---:|
| Machinery and equipment | $50,804 | |
| Automobiles | 3,697 | |
| Leasehold improvements | 6,704 | |
| Office equipment | 7,984 | |
| Sales equipment | 692 | |
| Molds | 11,405 | |
| | 81,286 | |
| Less: accumulated depreciation | 8,372 | 72,914 |

*Other assets:*

| | | |
|---|---:|---:|
| Unamorized [sic] organization expense | 650 | |
| Unamortized pre-production costs | 6,620 | |
| Deposits | 1,300 | 8,570 |
| | | 148,932 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

*Current liabilities:*

| | |
|---|---:|
| Notes payable—banks | 45,000 |
| Installment notes payable—current | 5,290 |
| Accounts payable | 32,939 |
| Payroll taxes—withheld and accrued | 6,829 |
| Overdraft—checking accounts | 168 |
| Accrued interest | 708 |
| Total current liabilities | 90,934 |

### LIABILITIES

*Current liabilities:*

| | | |
|---|---:|---:|
| Notes payable—bank | | $60,000 |
| Installment note payable | | 681 |
| Accounts payable | | 15,221 |
| Payroll taxes withheld and accrued | | 1,296 |
| Total current liabilities | | 77,198 |

*Long-term debt:*

| | | |
|---|---:|---:|
| Note payable—stockholder | | 60,000 |

*Stockholders' equity:*

| | | |
|---|---:|---:|
| Common stock | $10,000 | |
| Retained earnings | 14,165 | 24,165 |
| | | 161,363 |

*Long-term liabilities:*
Installment notes ........................................ $11,915
   Less: current portion above ......................... 5,290      $6,625
*Other liabilities:*
Loan payable—stockholder .............................................. 4,265
*Stockholders' equity:*
Common stock ......................................... 73,500
Net (loss)—year to date—(Exhibit B) .............. (26,392)     47,108
                                        148,932

Prepared without audit.

Although Imhoff found problems with the treatment of certain items on the balance sheet and, therefore, believed Marblcast had a net worth substantially below the $47,108 listed therein, he nevertheless agreed to make the loan. The primary reason for granting the loan was Imhoff's confidence in Duncan's management ability and his belief that with additional working capital, Marblcast had a good chance of success. Imhoff's judgment proved correct, for, subsequent to the loan, Marblcast became a profitable company.

On March 17, 1970, Dycap entered into a financing agreement with Marblcast and Ballinger which provided, inter alia, for Dycap to agree to loan Marblcast $100,000 for the purposes of acquiring 100 percent of Ballinger's common stock and increasing its working capital. A 3-percent loan fee ($3,000) was added to the face amount of the loan. The loan bore a 10-percent variable interest rate, whereby it was adjusted semiannually to 1½ percent over the prime rate of the First National City Bank of New York City. The loan had an 8-year term, but it provided for prepayment at the option of Marblcast.

In addition to the interest and points, and as a condition to the making of the loan, Marblcast was required to sell to Dycap 20 percent of its outstanding stock for the sum of $500. This requirement was spelled out in article 1, section 5 of the financing agreement between Marblcast, Ballinger, and Dycap which provided:

Section 5. Subject to the terms and conditions of this Agreement, MARBLCAST agrees to sell to DYCAP and DYCAP agrees to buy from MARBLCAST:

20% of the amount of outstanding and subscribed for common stock of MARBLCAST thirty (30) days from the date of this Financing Agreement at a total price of $500.00.

Both parties were represented by counsel throughout the negotiations leading up to the execution of the loan agreement. These negotiations were at arm's length, without collusion between the parties. The consideration paid for the Marblcast stock was set by a committee of Dycap and was not subject to negotiation by Marblcast. The loan and the stock purchase were part of a single integrated transaction and were mutually dependent and interrelated in that one event would not have occurred without the other.

Due to additional stock sales by Marblcast, as will be hereinafter discussed, the 20-percent interest in Marblcast equaled 24,050 shares. These shares were issued[5] to Dycap as fully paid and nonassessable for its $500 investment no later than April 16, 1970. The consideration per share was approximately $0.02.

Previous to the consummation of the financing agreement, Duncan had been informed by his attorney that under the Georgia Blue Sky Laws, stock could not be issued for less than par value. Duncan considered the transaction to be a purchase by Dycap of 24,050 shares for $24,050, consisting of a cash payment of $500 and a constructive loan fee of $23,550.

When Marblcast borrowed money from two Atlanta banks sometime prior to the negotiations with Dycap, Duncan was required to convert his $60,000 loan to Marblcast into 60,000 shares of stock.

The net proceeds from the Dycap loan were dispersed as follows: (1) $36,000 was used to purchase a 100-percent interest in Ballinger; (2) $40,000 was used to retire a short-term note payable in favor of the First National Bank of Atlanta, Ga.; and (3) the remaining $24,000 was used to provide Marblcast with working capital.

Immediately after this transaction, Ballinger became a wholly owned subsidiary of Marblcast.

During the loan negotiations, it was suggested by Imhoff that outside capital should be raised by Marblcast. Imhoff approached three associates who agreed that Marblcast might be a good investment. Duncan was also successful in interesting an associate of his to invest in Marblcast. Within 3 weeks of the

---

[5]The record does not indicate if these shares were held by Marblcast as treasury stock. Since Duncan testified that there had never been a redemption, we will assume that the shares transferred had been previously unissued.

March 17, 1970, financing agreement, Marblcast entered into subscription agreements with the following individuals in the following amounts:

William Randall .......... 4,000 shares
J. L. Fitzgerald ..........10,000 shares[6]
Henry Egner .............. 1,000 shares
Andrew Baur ............. 2,500 shares

The consideration to be paid by these individuals for the Marblcast stock was $1 per share, or approximately 50 times the amount that Dycap paid for its interest in Marblcast.

All of these individuals knew all relevant facts about the financial condition of Marblcast and could be termed sophisticated investors. Randall is an attorney and was president of Dycap. Egner was Dycap's largest shareholder, and Fitzgerald, a director of Dycap, was acting for himself and as trustee for the attorney of the Ballinger family. Baur was formerly a loan officer at the First National Bank of Atlanta, Ga. (the bank at which Marblcast had previously obtained financing).

The subscription agreements, with the exception of Baur's,[7] were subject to the following conditions:

(1) Consummation of the $103,000 loan by Dycap to Marblcast; (2) acquisition of all the Ballinger stock by Marblcast; and (3) qualification of the subscription and/or the shares to be issued pursuant to the applicable Blue Sky Laws.

All four individuals actually purchased the stock in Marblcast after the Dycap loan had been consummated. Randall, Fitzgerald, and Egner invested in Marblcast solely due to Dycap's loan to Marblcast.

Pursuant to the Dycap loan agreement, Marblcast was obligated to hire an independent accountant suitable to Dycap. Marblcast retained the certified public accountant firm of Arthur Young & Co., which prepared Marblcast's financial statements for the taxable periods immediately following Dycap's loan. No deferred loan costs were reflected on Marblcast's balance sheet submitted to Dycap for the period ending September 30, 1970, or on the consolidated balance sheet for Marblcast

[6]Five thousand shares purchased in Fitzgerald's name were held by him as trustee for a Mr. Grigsby, the attorney for the Ballinger family.

[7]No evidence was offered by either party as to the nature of the agreement between Marblcast and Baur.

and Ballinger for the period ending March 31, 1971. Additionally, there was no indication in the minutes of the special meeting of Marblcast's board of directors, dated March 16, 1970, that Marblcast would sell 20 percent of its outstanding stock at a discount.

In 1973, Marblcast obtained a loan from the SBA in the amount of $180,000 for the purpose of new construction. Also in 1973, Marblcast repaid the Dycap loan.

In 1974, both Marblcast and Ballinger were dissolved and the assets of both these corporations were transferred to a newly formed Ohio corporation, Duncan Industries, the petitioner herein. Dycap received 500 shares of Duncan Industries for its interest in Marblcast. These shares were repurchased by Duncan Industries for $48,100 in 1974, which is approximately 96 times greater than Dycap's original investment.

On its tax returns for the taxable periods subsequent to the acquisition of the loan, petitioner took the position that the shares purchased by Dycap were issued at a discount, the fair market value of the stock being $1 per share. It amortized the amount of the discount ($24,050 minus $500 = $23,550) over the 8-year term of the loan. For the taxable year ending March 31, 1974, the year in which petitioner paid the Dycap loan, it claimed a "loss on early extinguishment of debt" in the amount of $13,002. This figure represented the unamortized portion of the claimed loan costs.

Respondent has disallowed the deduction, inter alia, on the basis that this loan cost was not actually incurred, stating the fair market value of the stock at the time of Dycap's purchase was not in excess of the $500 received.

### ULTIMATE FINDING OF FACT

The fair market value of the Marblcast stock at the time of the sale to Dycap was $1 per share or $24,050.

### OPINION

We must determine the fair market value of the 24,050 shares of Marblcast sold to Dycap pursuant to the financing agreement entered into by the respective parties. Petitioner contends the value on that date was $24,050 ($1 per share). Respondent asserts the value was $500 ($0.02 per share).

The issue is before us due to respondent's disallowance of

petitioner's amortization of the "loan fee" which petitioner contends Marblcast paid to Dycap in the form of a discount sale of Marblcast's stock. Respondent contends that petitioner has failed to establish that these costs were actually incurred, it being his position that the consideration paid by Dycap for the Marblcast stock equaled its fair market value at the time of sale.

Commissions and fees paid to obtain a loan are capital expenditures and may be ratably deducted[8] over the life of the loan. *Detroit Consolidated Theatres, Inc. v. Commissioner*, 133 F.2d 200 (6th Cir. 1942).[9] In order to prevail, petitioner has the burden of showing that these costs were actually incurred in the form of a discount sale of stock to Dycap in connection with the acquisition of the loan. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. If the transaction was simply a sale of stock for less than par, this would affect only the capital structure of petitioner and would not affect its operating income, so no deduction would be available either as a current business expense, or as a loss, or as an amortization deduction. On the other hand, if the stock was sold to Dycap at a discount in lieu of a fee for making the loan, any discount from fair market value would be a business expenditure. *Emerson Electric Manufacturing Co. v. Commissioner*, 3 B.T.A. 932 (1926).

Initially, there is no question that the stock sale was not a separate and distinct transaction from the loan. Respondent's witness, Imhoff, Dycap's general manager at the time, expressly stated on numerous occasions during the trial that Dycap would not have advanced Marblcast any funds without being afforded the opportunity to acquire an equity position in Marblcast. Dycap did not charge the maximum interest rate it could charge under SBA regulations; instead, it acquired a 20-percent stock

---

[8]No issue has been raised that the transaction was a mere bargain purchase with no tax consequences accruing to it. See *Palmer v. Commissioner*, 302 U.S. 63 (1937); *Aspegren v. Commissioner*, 51 T.C. 945 (1969); *Gardner-Denver Co. v. Commissioner*, 75 F.2d 38 (7th Cir. 1935), cert. denied 295 U.S. 763 (1935).

Additionally, though respondent makes the assertion on brief that the expense in question was not ordinary and necessary, he appears to abandon that contention as he makes no argument to support it. We note, however, that even if respondent is correct in his contention, the expenditures in question would properly be amortizable as being in the nature of interest, unless otherwise disallowed by another provision of the Code. See *Wilkerson v. Commissioner*, 70 T.C. 240 (1978); *Lay v. Commissioner*, 69 T.C. 421 (1977).

Also, neither party discussed the possible applicability of secs. 1.163–4(a) and 1.1232–3(b)(2)(ii), Income Tax Regs., to this transaction, so we have not considered it.

[9]See also Rev. Rul. 75–172, 1975–1 C.B. 145.

interest in petitioner for a very small investment which, if petitioner was successful, would pay it a handsome rate of return on the loan, which it did, presumably as capital gain. We believe this arrangement was designed by Dycap and was insisted on in lieu of a cash fee for making the loan. Certainly, petitioner would not have sold 20 percent of its stock for $500 if its sole purpose was to raise capital. It simultaneously acquired $17,500 additional capital by selling 17,500 shares of its stock to four individual investors for $1 per share.

We therefore find that the stock sale and obtention of the loan were mutually dependent on each other and that if any discount was involved, such discount was an additional cost of the loan.

Next, we turn to the question of whether there was in fact a discount involved on this sale. To resolve this issue, we must determine the value of the stock on the date of sale.[10] The question of "valuation of stock for tax purposes is a matter of 'pure fact.'" *Hamm v. Commissioner*, 325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. In general, this question requires a determination of "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031–1(b), Estate Tax Regs.; *United States v. Cartwright*, 411 U.S. 546, 551 (1973); see also *Estate of McNary v. Commissioner*, 47 T.C. 467 (1967).

In determining the value of unlisted stocks, actual sales made in reasonable amounts at arm's length, in the normal course of business within a reasonable time before or after the valuation date are the best criteria of market value. *Fitts' Estate v. Commissioner*, 237 F.2d 729 (8th Cir. 1956).

In efforts to comport with this standard, both petitioner and respondent offer as evidence sales of Marblcast's stock. Respondent offers the sale to Dycap at $0.02 a share in support of his determination. Petitioner offers the sales to the individual investors at $1 a share to prove the same. We feel the sales to the individual investors more clearly reflect the true value of the

---

[10]No evidence was presented to establish the exact date of sale. Art. 1, sec. 5 of the Mar. 17, 1970, financing agreement provided for the sale to occur within 30 days of the above date. Since the parties have stipulated that the stock was actually paid for and received, we find that the sale occurred no later than Apr. 16, 1970.

stock sold to Dycap and we, therefore, hold the petitioner has carried his burden of proof.

The respondent's reliance on the sale between Marblcast and Dycap as setting the market value of the stock is not justified, for, while it is true that both parties were represented by counsel and the negotiations were at arm's length, respondent overlooks the fact that Marblcast was compelled to enter the transaction.

Although in a normal situation the purchase price of the property changing hands between two unrelated parties would be highly reflective of fair market value *(Grill v. United States,* 157 Ct. Cl. 804, 303 F.2d 922, 927 (1962)), this is not the case before us.

On the facts before us, we observe that Marblcast, a financially troubled corporation, desired to purchase Ballinger to obtain badly needed sales accounts. Marblcast believed that the purchase of Ballinger would greatly improve its financial outlook and that is what in fact happened. Marblcast approached conventional lending institutions about the possibility of financing this purchase but met with no success. It was under these circumstances that Marblcast approached Dycap to finance the purchase of Ballinger. Dycap agreed to make the loan, but on the condition that it be allowed to purchase 20 percent of Marblcast's stock for $500. This price was determined by a committee of Dycap, and we do not believe it was open to negotiation. In essence, it was a "take it or leave it" proposition. Faced with the proposition of forgoing the Ballinger purchase, we feel that Marblcast had no choice but to assent to the sale. This hardly presents the situation of a willing seller under no compulsion. It is more akin to a forced sale which the regulations admonish us not to consider. See sec. 20.2031–1(b), Estate Tax Regs. "The fair market value of * * * property * * * is not to be determined by a forced sales price." See also *Heiner v. Crosby,* 24 F.2d 191 (3d Cir. 1928). This element of compulsion precludes a determination of value by reference to that sale. *Palmer v. Commissioner,* 62 T.C. 684 (1974), affd. 523 F.2d 1308 (8th Cir. 1975).

Far more persuasive of the value of the stock sold to Dycap is the sales price of the shares sold to Randall, Fitzgerald, Egner, and Baur. These sales occurred relatively close in time to the

Dycap sale so as to accurately reflect the market conditions existing on the date of the Dycap sale.[11] Cf. *Fitts' Estate v. Commissioner, supra*. Moreover, these sales lacked the element of compulsion on the part of the parties that is fatal to the consideration of the Dycap sale.

When looking to the position of the parties relative to these sales, we find a totally different picture. The motive behind these sales was the desire on the part of Marblcast to raise additional capital. Although it was advantageous for Marblcast to procure additional capital, in no sense was this necessary, nor was it compelled to do so. Additionally, the evidence lends itself to the conclusion that these parties entered into the transaction with complete knowledge of all the facts relative to the financial condition of Marblcast and Ballinger. Randall, Fitzgerald, and Egner were all directors of Dycap. They possessed at that time all the financial information supplied by Marblcast to Dycap. Additionally, since Dycap was also a shareholder of Ballinger, we assume that they were familiar with the financial picture of that company. Moreover, respondent's witness affirmatively stated that Randall and Egner could be termed sophisticated investors. We are also prepared to assume that Baur was relatively informed about the condition of Marblcast since he had previously been involved in a lending transaction with it.

Although we recognize that isolated sales are not determinative of fair market value in face of evidence to the contrary, no such evidence has been introduced, and we are persuaded that these sales are indicative of the fair market value of the stock on the relevant date. The fact that Duncan agreed to accept 60,000 shares of stock in payment of his loan of $60,000 to Marblcast also lends support to this conclusion.

Respondent contends that the price paid by the individual investors is not a true indicator of the value of the shares on the relevant date for the following reasons: (1) The subscription agreements were conditioned on the consummation of the loan agreement and the purchase of Ballinger; (2) the infusion of capital substantially improved the net worth of Marblcast and, therefore, the value of the shares sold to the individual investors; and (3) the net worth of Marblcast was substantially

---

[11]We have found that the sale to Dycap occurred before Apr. 16, 1970; the evidence established that Randall, Fitzgerald, and Egner purchased their shares before that date, and that Baur purchased his interest no later than Apr. 21, 1970.

below the $47,000 figure listed on the balance sheet submitted to Dycap.[12]

In disposing of respondent's first two contentions, we note that respondent has failed to consider that the sale to Dycap was also contingent on the completion of the loan agreement and the purchase of Ballinger. Since we have found as a fact that the loan and the sale were part of a single integrated transaction, we find that whatever increment in value resulted from the obtention of the loan existed on the date of the sale to Dycap as well as on the dates of the sales to the individuals. We find this not because the loan and sales were made in any temporal order but because all sales were made in contemplation of the loan. We also note in passing that to accept respondent's position would require us to hold that the infusion of $100,000 capital, although accompanied by an offsetting liability, increased the value of Marblcast 50 times in a period of less than 30 days. This we simply cannot do.

To support his third contention, respondent offered the testimony of one witness, A. Gordon Imhoff. Imhoff is currently Dycap's president and was the individual most responsible for negotiating the loan. In addition to his duties at Dycap, Imhoff is also a registered representative with the New York Stock Exchange and has worked in the financial and security fields since 1946.

In analyzing the Marblcast balance sheet for the period ending December 31, 1969, Imhoff found problems with the treatment of the following items: (1) Inventories, (2) molds, and (3) unamortized preproduction and organizational expenditures. Without going into Imhoff's testimony on this matter, it will suffice to say that he testified that the inclusion of these items as assets resulted in an inaccurate picture of the true net worth of Marblcast, but he did not indicate by how much.

While the value of the assets is not ordinarily relied on to determine fair market value of stock of a small closely held operating corporation (*Palmer v. Commissioner, supra* at 699; *Weber v. Rasquin,* 101 F.2d 62, 64 (2d Cir. 1939)), reference may

---

[12]Of course, if there were only 10,000 shares outstanding at the time, which we believe to be the fact, the book value of those shares would be $4.70 per share.

be made to asset value or book value to justify a conclusion as to fair market value based on other factors.[13] Even if the inventories, molds, and unamortized expenses referred to by Imhoff were eliminated entirely from the assets listed on the December 31, 1969, balance sheet, the stockholders' equity would still be about $10,000 or $1 per share on the 10,000 shares outstanding. And an examination of the March 31, 1970, balance sheet, which we have set out in a footnote and which appears to be revised somewhat along the lines of Imhoff's objections, reveals that the 10,000 shares of stock outstanding had a book value of $2.41 per share.

Another factor which we found to be compelling in our determination that the fair market value of Marblcast may have been even in excess of the value shown on the balance sheets is the excellent management capability of Duncan which Imhoff indicated was one of the primary reasons for his approval of the loan. See *Estate of Vandenhoeck v. Commissioner*, 4 T.C. 125, 127 (1944). It appears that Imhoff's reliance on Duncan's competence was well justified because within 4 years Dycap was able to liquidate its investment in the stock for approximately $48,100, a profit exceeding 96 times its original investment.

Imhoff's testimony suggests that the stock acquisition by Dycap came first and that Dycap felt it was paying fair value for the stock.[14] Imhoff readily admits, however, that Dycap would not have bought the stock unless the loan was also consummated, and a closer analysis of his testimony convinces us that Dycap gave little consideration to the actual value of the stock—it simply insisted on receiving a 20-percent equity interest in Marblcast for as little investment as possible. This was a condition and consideration for making the loan without an additional front-end fee. What an SBIC is willing to pay for an equity interest in a borrower is not a very reliable measure of the value of that interest. The increment in value of the equity investment is often the only way the SBIC will make a reasonable profit on the loan.[15]

---

[13]Here, Marblcast had been in existence for such a short time that capitalization of earnings and other factors that are usually considered in valuing stock would not be reliable.

[14]We note that it was probably in the best interests of Dycap, taxwise, as well, to keep the fair market value of petitioner's stock low. Imhoff was president of Dycap at the time he testified.

[15]In fact, the testimony at trial indicated that, due to a drop in the prime rate, Marblcast at one point was paying less interest to Dycap than the 7⅜ percent which Dycap was paying the SBA on the money that it had to borrow in order to make the loan.

Respondent also argues that there was an absence of intent on the part of Marblcast to sell stock at a discount. While intent of the parties is a factor in determining the ultimate deductibility of certain expenditures (see *Aspegren v. Commissioner*, 51 T.C. 945 (1969); *Gardner-Denver Co. v. Commissioner*, 75 F.2d 38 (7th Cir. 1935), cert. denied 295 U.S. 763 (1935)), it is not a factor that is helpful or determinative of fair market value. However, possibly because of the Blue Sky Law which prohibited a sale of stock for less than par value, petitioner does not claim that it sold the stock to Dycap at a discount. Rather, it claims that it sold the stock for $24,050 and that the difference between the amount actually paid by Dycap and $24,050 was payment by petitioner of a loan fee. Moreover, the fact that petitioner was simultaneously selling its stock to four individuals. at par[16] indicates that petitioner was intentionally transferring the stock to Dycap for less than what it considered to be fair market value.

We have considered respondent's other arguments and find them equally unpersuasive that the sales to the individual investors are not the best evidence of the fair market value of the Marblcast stock on the facts before us. Accordingly, we find that the fair market value of the Marblcast stock sold to Dycap was $24,050 ($1 per share).

Respondent next contends that the nonrecognition provisions of section 1032 apply to disallow petitioner's amortization deduction. Section 1032 provides that a corporation shall not recognize gain nor loss "on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation." It appears to be respondent's position that the sale for $500 between Marblcast and Dycap involved no more than a readjustment of Marblcast's capital structure. Implicit in respondent's argument is the conclusion that there has been no expenditure of the $23,550 that Marblcast seeks to amortize.

We do not agree with respondent and for reasons set forth below, hold that section 1032 has no application to the transaction in issue.

Section 1032 was originally enacted by the 1954 Code. It has no counterpart in the 1939 Code. The purpose of its enactment

---

[16]By emphasizing this fact, we do not imply that the par value of the shares influenced our determination of value.

was to remove the uncertainties that existed under current law. H. Rept. 1337, 83d Cong., 2d Sess. 268; S. Rept. 1622, 83d Cong., 2d Sess. 426.

Before 1954, the regulations generally provided that a corporation realized no gain or loss on the original issuance of its stock. When, however, a corporation dealt in its treasury stock as it might in the shares of another corporation, gain or loss would be recognized.

Whether a corporation was dealing in its own shares as it might in the shares of another corporation depended upon the real nature of the transaction, as ascertained from all its facts and circumstances. Sec. 29.22(a)–15, Regs. 111. See also *Commissioner v. S. A. Woods Mach. Co.*, 57 F.2d 635 (1st Cir. 1932).

Divergent views as to the circumstances in which a corporation would recognize gain or loss on the sale of its treasury stock developed. Some courts read the regulation mechanically and held that whenever a corporation acquired its own shares for the purpose of reselling them, and did resell them, then the gain was taxable regardless of motive. *Commissioner v. H. W. Porter & Co.*, 187 F.2d 939 (3d Cir. 1951), revg. 14 T.C. 307 (1950). See also *Commissioner v. Batten, Barton, D. & O.*, 171 F.2d 474 (2d Cir. 1948), revg. 9 T.C. 448 (1947); *Commissioner v. Rollins Burdick Hunter Co.*, 174 F.2d 698 (7th Cir. 1949), revg. 9 T.C. 169 (1947); *Commissioner v. Landers Corp.*, 210 F.2d 188 (6th Cir. 1954), revg. a Memorandum Opinion of this Court.

Originally, this Court and the Court of Claims did not follow this reasoning and held that for the gain to be taxable, the purchase and sale must have been made with a profit or investment motive. *H. W. Porter & Co. v. Commissioner*, 14 T.C. 307 (1950), revd. 187 F.2d 939 (3d Cir. 1951); *Dr. Pepper Bottling Co. of Miss. v. Commissioner*, 1 T.C. 80 (1943); *Anderson Clayton & Co. v. United States*, 129 Ct. Cl. 295, 122 F. Supp. 837 (1954), affd. 350 U.S. 55 (1955). But see *Burrus Mills, Inc. v. Commissioner*, 22 T.C. 881 (1954).

Although it is not completely clear from the legislative history, we believe that it was this conflict in the above-cited cases that created the uncertainty in the law that section 1032 was enacted to remedy. It was intended to give uniform treatment to the taxability of consideration received as the subscription price for corporate stock. This is not the issue before

us, for in none of the above-cited cases does it appear that the sales in question were for anything other than fair value.

As to the situation before us, we do not feel that section 1032 altered the existing law as to the tax consequences accruing to a corporation when it pays an otherwise deductible expense by issuance of its own stock. Before 1954, the law was well settled that the fair market value of stock was deductible as a business expense if the payment of cash would have otherwise given rise to such deduction. *Haskell & Barker Car Co. v. Commissioner*, 9 B.T.A. 1087 (1928); *W. M. Ritter Lumber Co. v. Commissioner*, 30 B.T.A. 231 (1934); *Alger-Sullivan Lumber Co. v. Commissioner*, 57 F.2d 3 (5th Cir. 1932); *National Bellas Hess, Inc. v. Commissioner*, 20 T.C. 636 (1953), affd. on other issues 220 F.2d 415 (8th Cir. 1955); *Hercules Powder Co. v. United States*, 149 Ct. Cl. 77, 180 F. Supp. 363 (1960). And this was so even though no gain (or loss) was recognized on the resale of the treasury stock. *Hercules Powder Co. v. United States, supra.*

Additionally, the Commissioner has appeared to adopt this position in Rev. Rul. 62–217, 1962–2 C.B. 59; Rev. Rul. 69–75, 1969–1 C.B. 52. In these rulings the Commissioner held the fair market value of stock (either treasury or unissued) is deductible as a business expense when paid as compensation. These rulings further held that the nonrecognition provisions of section 1032(a) have no effect on a business expense deduction otherwise allowable under section 162. Implicit in these determinations is the view, which we hold is correct, that section 1032 did not alter existing law on the issue. See also *Hollywood Baseball Association v. Commissioner*, 42 T.C. 234 (1964), affd. on other issues 352 F.2d 350 (9th Cir. 1965), allowing amortization of organizational expenditures paid with the corporation's stock. See also B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 3.13, pp. 3–53, 54 (4th ed. 1979).

We find this situation to be no different than if petitioner had sold 24,050 shares of stock to third parties and had used the proceeds of the sale to pay Dycap its loan fee. We therefore find that petitioner has actually incurred a deductible expenditure. To hold otherwise would exhalt form over substance. See also *Hudson Motor Car Co. v. United States*, 78 Ct. Cl. 117, 3 F. Supp. 834, 846 (1933), where the court noted: "if the additional compensation had been paid in cash and the cash had been used

to acquire the stock, no question * * * could have been raised as to its deductibility."

Respondent's reliance on *McCoy-Garten Realty Co. v. Commissioner*, 14 B.T.A. 853 (1928), and *Carter Hotel Co. v. Commissioner*, 67 F.2d 642 (4th Cir. 1933), is misplaced.

In *McCoy-Garten Realty Co.*, the principal issue was whether the preferred stock actually represented stock or debt, and the reason for the conclusion that the discount on the sale of the preferred stock could not be amortized was apparently that it was sold to raise capital rather than pay an expense. Also, there was no evidence as to whether the taxpayer's stock had been sold below market value, as we find here. The facts in *Carter Hotel* present a pure original issuance of stock, below par, to raise capital. No contention in that case was made that the taxpayer was actually paying an otherwise deductible expense.

Accordingly, we hold that section 1032 has no application to the transaction in issue.

Finally, respondent argues the petitioner has not established its entitlement to a deduction under the provisions of section 83.[17] While we agree with respondent, we fail to see how this helps his position.

Section 83(a) applies generally to establish the tax consequences attaching to a situation where restricted property

---

[17]SEC. 83. PROPERTY TRANSFERRED IN CONNECTION WITH PERFORMANCE OF SERVICES.

(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(h) DEDUCTION BY EMPLOYER.—In the case of a transfer of property to which this section applies or a cancellation of a restriction described in subsection (d), there shall be allowed as a deduction under section 162, to the person for whom were performed the services in connection with which such property was transferred, an amount equal to the amount included under subsection (a), (b), or (d)(2) in the gross income of the person who performed such services. Such deduction shall be allowed for the taxable year of such person in which or with which ends the taxable year in which such amount is included in the gross income of the person who performed such services.

(including stock) is transferred in connection with the performance of services. Section 83(h) expressly allows the person for whom the services were performed to deduct an amount equal to the amount includable in the service performer's income under section 83(a). It further provides for the year in which the deduction must be claimed. Respondent takes the position that since no services were performed by Dycap in connection with the transfer of the Marblcast stock, the expense is, therefore, not deductible.

It appears that respondent reads section 83(h) as a substantive deduction-granting section with which taxpayers transferring stock must show compliance before being entitled to a claimed deduction. Respondent's interpretation of that section is clearly incorrect. Section 83(h) is a modification of section 162 which only affects the time and amount of deductions otherwise allowable, when property is transferred in connection with services. Compliance with the requirements of section 83(h) is not necessary to entitlement of a deduction unless the transaction in issue falls within its intended scope.

It is conceded that no services were provided by Dycap in consideration for the transfer of the Marblcast stock. Section 83 is expressly applicable only when services are performed in consideration for transfers of property. Since section 83 is not applicable to the facts in issue, section 83(h) poses no additional independent requirement to the deductibility of the expenditure in question.

We conclude that respondent was in error in disallowing the amortization deductions claimed by petitioner.

Because of petitioner's concession on another issue,

*Decision will be entered under Rule 155.*