ESTATE OF ARTHUR F. LITTLE JR., JOAN LITTLE, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Little v. Commissioner
Docket No. 9410-77.
United States Tax Court
T.C. Memo 1982-26; 1982 Tax Ct. Memo LEXIS 720; 43 T.C.M. (CCH) 319; T.C.M. (RIA) 82026; January 18, 1982. *720 Held, fair market value of stock determined. Barret F. Kalb, for the petitioner. Joseph F. Maselli, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: By letter dated June 10, 1977, respondent determined a deficiency of $ 50,455.51 in petitioner's Federal estate tax.The sole issue for our decision is the date of death value of corporate stock. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts together with exhibits attached thereto are incorporated *721 herein by this reference. Arthur F. Little, Jr. died on August 19, 1973 in Newton, New Jersey. Joan Little, the decedent's surviving spouse, is the executrix of the estate of Arthur F. Little, Jr. Joan Little was a resident of Marathon, Florida when the petition was filed herein. The Federal estate tax return for the estate of Arthur F. Little, Jr. was timely filed with the District Director of Internal Revenue, Newark, New Jersey. [1]
Prior to his death, decedent was an officer and shareholder of Atlantic Can Company (hereafter referred to as Atlantic), a corporation engaged in the manufacture of a precision component for use in automobile oil filters. Atlantic also manufactured decorative cannisters and trays for packaging fruit cakes and cookies. Atlantic owned 50 percent of a subsidiary which manufactured a variety of plastic housewares. [2]
*722 As of March 31, 1972 Atlantic had 129,000 shares of common stock issued and outstanding. These shares were owned equally by decedent, John Fuller (hereafter referred to as Fuller) and Franklin Colcord (hereafter referred to as Colcord), who were the founders of Atlantic. [3]
In late 1972 or early 1973 Colcord, the president of Atlantic, suffered a stroke, necessitating his retirement. In order to provide Colcord with income for retirement, decedent and Fuller decided to have Atlantic redeem Colcord's 43,000 shares with real property owned by Atlantic, which property Atlantic would then lease from Colcord for 15 years at an annual rental of $ 100,000 with an option to purchase the building at the end of the lease term for $ 1,000,000. [4] Fuller and decedent also decided to accept an offer of reorganization between Atlantic and Centennial Industries, Inc. (hereafter referred to as Centennial). *723 As of March 31, 1971, March 31, 1972 and March 31, 1973 the stockholders' equity in Atlantic was $ 1,676,012, $ 1,828,757 and $ 1,536,630, respectively. Atlantic's balance sheets reflected 129,000 shares of stock issued and outstanding for the years ended March 31, 1971 and March 31, 1972 and 86,000 shares of stock issued and outstanding for the year ended March 31, 1973. On April 5, 1973 Atlantic's shareholders entered into a plan of reorganization with Centennial. Under the plan of reorganization Centennial was to acquire the 86,000 outstanding shares of Atlantic stock in exchange for 185,000 shares of Centennial's voting common stock with a par value of 10 cents per share. The plan of reorganization called for 166,500 shares of Centennial stock to be delivered to Atlantic's shareholders outright and 18,500 to be held in escrow for a period of 2 years after closing should previously undisclosed obligations of Atlantic be discovered or receivables of Atlantic go uncollected.The number of shares of Centennial stock to be delivered to Atlantic's shareholders pursuant to the plan of reorganization was subject to adjustment depending upon the "tangible net worth" of Atlantic as *724 of March 31, 1973. For purposes of the stock adjustment agreement and the escrow account the Centennial stock was to be valued at $ 10 per share. The plan of reorganization also called for the shareholders of Atlantic to deliver to Centennial irrevocable proxies for their Centennial stock. On April 5, 1973, Centennial and Atlantic's shareholders executed the following "Supplementary Agreement:" In order to induce the Shareholders to enter into a Plan of Reorganization and Agreement dated April 5, 1973 (the "Reorganization Agreement"), pursuant to which Centennial will acquire from the Shareholders all of the issued and outstanding shares of capital stock of Atlantic Can Company, Centennial hereby agrees with the Shareholders as follows: 1. Subject to the limitations hereinafter set forth, if at any time after the second anniversary of the Closing Date (as defined in the Reorganization Agreement) and prior to the fifth anniversary of the Closing Date, Shareholders holding at least 75,000 shares (as presently constituted) of Centennial Stock (as defined in the Reorganization Agreement) so request, Centennial will prepare as promptly as feasible and file a registration statement *725 under the Securities Act of 1933 (the "Act") covering such number of shares of Centennial Stock received by the Shareholders pursuant to the Reorganization Agreement as the Shareholders request to be registered. Centennial will use its best efforts to cause such registration statement to become effective under the Act as soon as reasonably practicable and will maintain the prospectus included in such registration statement at the time it becomes effective under the Act current for a periof of 90 days subsequent to such effective date. 2. Anything contained herein or in the Reorganization Agreement to the contrary notwithstanding, Centennial shall not be obligated to file a registration statement requested pursuant to Section 1 of this Supplementary Agreement if within 90 days after the date of such request there shall be available "adequate current public information" (within the meaning of Rule 144 under the Act) with respect to Centennial. 3. Centennial may delay the preparation and filing of any registration statement under Section 1 of this Supplementary Agreement until the audited financial statements requisite to such filing have been prepared in the ordinary course of *726 Centennial's business. 4. In the event Centennial shall receive a request from any of the Shareholders for registration of shares of Centennial Stock pursuant to Section 1 of this Supplementary Agreement, Centennial shall promptly notify the other Shareholders thereof and afford them an opportunity to join in such registration. Centennial shall not be obligated to file such registration unless within 30 days after having given notice to the Shareholders pursuant to this Section 4, Centennial shall have received requests for registration of at least 75,000 shares of Centennial Stock. As a result of the adjustment provision of the plan of reorganization the number of Centennial shares to be exchanged for the 86,000 Atlantic shares was increased to 193,663. On or about April 27, 1973 the plan of reorganization was carried out and Centennial acquired all of the stock of Atlantic. Decedent, as of the date of death, owned 84,331 shares of the Centennial stock. Of those shares, 75,248 shares were owned outright by decedent and 9,083 shares were held in the escrow account on the date of his death. At the time of decedent's death Centennial was a closely held corporation. As of April 30, 1973 decedent's *727 84,331 shares of Centennial represented 8.67 percent of the 10 cents par value voting common stock of Centennial. Centennial began operations in 1879 under the name Biddle Purchasing Company and its business consisted of a buying service for hardware wholesalers. The company later expanded its buying service to include subscribers in the automotive, food, general merchandise, lumber and other businesses. In 1932 and 1962 the company acquired two subsidiaries engaged in the importation of food products. In 1972 the company's name was changed to Centennial Industries, Inc. At that time, Centennial brought in three senior executive officers and decided upon an acquisition program concentrating on the automotive replacement parts and general merchandise businesses. From 1972 through July of 1973 Centennial acquired a total of six new subsidiaries -- four in automotive replacement parts business and two in the general merchandise business. The following table sets forth the percentage of total revenue and income before taxes by each line of Centennial's businesses for the years 1968 through 1972 (including information reflected on a pro forma basis to include for all of 1972 *728 the results of operations of all business acquired by Centennial since January of 1972): 1968
1969
1970
Revenues
Income
Revenues
Income
Revenues
Income
Automotive
Replacement Parts
Food Products
64%
57%
62%
43%
63%
70%
General
Merchandise
17 2 16 3 15 1 Merchandising
Services *
19 41 22 54 22 29 100%
100%
100%
100%
100%
100%
1972
(On Pro
1971
1972
Forma Basis)
Revenues
Income
Revenues
Income
Revenues
Income
Automotive
Replacement Parts
14%
6%
39%
28%
Food Products
66%
83%
57 77 29 47 General
Merchandise
14 1 10 1 22 13 Merchandising
Services *
20 16 19 16 10 12 100%
100%
100%
100%
100%
100%
Sometime during April of 1973 decedent executed an irrevocable 2-year proxy for all of the Centennial stock which decedent would otherwise be entitled to vote. The proxy was in favor of Derrick A. M. Smith and provided for its termination if at any time subsequent to its execution Smith should cease to be the President or other chief executive *729 officer of Centennial. On September 27, 1973, which was after the date of decedent's death, Centennial issued stock certificate number E433 representing 75,248 shares of 10 cents par value common stock to the decedent. The certificate bore the following language: This certificate and the shares represented hereby have not been registered under the Securities Act of 1933, as amended (the "Act"), and may not be transferred in the absence of an effective registration statement relating thereto under the Act or delivery to the Company of (i) a letter from the proposed transferee addressed to the Company stating in substance that (a) such shares proposed to be acquired by the transferee are being acquired for his own account and not with a view to, or for resale in connection with, any distribution thereof, (b) the transferee understands that the shares acquired must be held indefinitely unless they are subsequently registered under the Act or an exemption from such registration is available, and (d) [sic] any sales of the shares in reliance upon Rule 144 under the Act can be made only in limited amounts in accordance with the terms and conditions of that Rule, and (ii) an opinion *730 of counsel to the Company to the effect that such transfer does not involve a transaction requiring prior registration under the Act. The language on decedent's stock certificate was included pursuant to a letter dated April 27, 1973 from decedent to Centennial in which decedent also stated that his Centennial stock was being acquired solely for investment purposes. In July 1973 a registration statement, Form S-1, dated June 29, 1973 was filed with the Securities and Exchange Commission of the United States (SEC), contemplating a public sale of 510,000 shares [5] of 10 cents par value stock of Centennial. The proposed maximum offering price listed on the Form S-1, estimated solely for calculation of the registration fee, was $ 10 per share. The Form S-1 and preliminary prospectus never became effective and were withdrawn, pursuant to Centennial's request, on July 11, 1974. *731 Sometime shortly after acquisition of his Centennial stock, decedent became interested in a real estate investment. In order to raise the necessary proceeds for the real estate, decedent sought a loan of $ 150,000 from Centennial. [6] Decedent was unable to obtain any funds using the Centennial stock as collateral. The following represents a consolidated statement of income of Centennial and its subsidiaries for the calendar years 1968 through 1972 and for the 3-month periods ended March 31, 1972 and March 31, 1973: [7]
Year ended December 31,
1968
1969
Revenue
Net sales
$ 14,921,960
$ 13,389,307
Service fees and other
charges to subscribers
3,388,050
3,757,668
Commission on consignment
sales
318,717
288,483
Cash discount earned
527,206
455,662
Other income
19,262
26,239
19,175,195
17,917,359
Costs and expenses
Cost of goods sold
13,500,691
11,927,240
Selling, general and administrative
4,354,412
4,538,897
Cash discount allowed
479,927
441,615
Interest
147,651
252,039
18,482,681
17,159,791
Income from continuing operations
before provision for income
taxes
692,514
757,568
Provision for income taxes
397,364
442,172
Income from continuing operations
295,150
315,396
Loss from discontinued operations,
net of income taxes
Net income
$ 295,150
$ 315,396
Average number of shares outstanding
1,014,070
1,034,041
Earnings per share of common
stock
Continuing operations
$ .29
$ .31
Discontinued operations
Net income
$ .29
$ .31
Cash dividends paid per common
share
$ .21
$ .18
*732 Year ended December 31,
1970
1971
1972
Revenue
Net sales
$ 13,194,142
$ 15,122,382 $ 17,562,729 Service fees and other
charges to subscribers
3,791,644
3,983,563 4,064,701 Commission on consignment
sales
410,247
404,454 607,226 Cash discount earned
407,929
391,275 380,733 Other income
14,645
34,869 36,597 17,818,607
19,936,543 22,052,036 Costs and expenses
Cost of goods sold
11,669,635
13,067,645 14,827,281 Selling, general and
administrative
4,814,011
5,193,423 6,012,853 Cash discount allowed
391,708
416,773 343,372 Interest
217,580
173,427 183,648 17,092,934
18,851,268 21,367,154 Income from continuing
operations
before provision for income
taxes
725,673
1,085,275 1,284,882 Provision for income taxes
411,000
560,103 566,800 Income from continuing
operations
314,673
525,172 718,082 Loss from discontinued
operations,
net of income taxes
(160,637)
(97,963)
Net income
$ 314,673
$ 364,535 $ 620,119 Average number of shares
outstanding
1,005,396
995,020 812,738 Earnings per share of
common
stock
Continuing operations
$ .31
$ .53 $ .88 Discontinued operations
(.16)
(.12)
Net income
$ .31
$ .37 $ .76 Cash dividends paid per
common
share
$ .16
$ .21 $ .10 *733 Three months ended
March 31,
1972
1973
Revenue
Net sales
$ 2,906,174 $ 7,267,823
Service fees and other
charges to subscribers
997,336 1,120,988
Commission on consignment
sales
139,233 142,548
Cash discount earned
75,247 83,247
Other income
4,564 7,246
4,122,554 8,621,852
Costs and expenses
Cost of goods sold
2,412,460 5,832,325
Selling, general and administrative
1,327,396 2,223,358
Cash discount allowed
82,466 67,260
Interest
13,468 124,696
3,385,790 8,247,639
Income from continuing operations
before provision for income
taxes
286,764 374,213
Provision for income taxes
156,900 147,000
Income from continuing operations
129,864 227,213
Loss from discontinued operations,
net of income taxes
(29,726)
Net income
$ 100,138 $ 227,213
Average number of shares outstanding
985,687 774,282
Earnings per share of common
stock
Continuing operations
$ .13 $ .29
Discontinued operations
(.03)
Net income
$ .10 $ .29
Cash dividends paid per common
share
$ .06 As of August 19, 1973 Centennial had no plans to pay out dividends to its shareholders. The following *734 is the consolidated balance sheet of Centennial and its subsidiaries as of December 31, 1972 and the unaudited pro forma combined balance sheet of Centennial and its subsidiaries with Atlantic as of March 31, 1973: December 31,
1972
March 31, 1973
Centennial
Atlantic
ASSETS
Current assets
Cash
$ 1,843,018 $ 764,473 $ 24,718
Receivables
9,356,306 9,015,803 392,100
Inventories
7,561,215 9,331,224 1,489,612
Prepaid expenses
275,585 178,393 45,140
Total current
assets
19,036,124 19,289,893 1,951,570
Property, plant and
equipment (net)
753,552 845,037 457,941
Other assets
Goodwill (net)
657,555 652,846 Equity in affiliated
companies
129,223
Other
116,881 76,250 142,969
774,436 729,096 272,192
$ 20,564,112 $ 20,864,026 $ 2,681,703
LIABILITIES
Current liabilities
Due to banks
$ 6,719,087 $ 8,313,175 $ 250,000
Current maturities
of long-term debt
521,741 584,892 Accounts payable
7,943,645 6,505,889 461,772
Other current
liabilities
549,635 475,711 384,625
Total current
liabilities
15,734,108 15,879,667 1,096,397
Deferred income taxes
$ 17,240 $ 16,625 $ 48,676
Long-term debt
1,042,463 970,220 8% subordinated
debentures
845,861 845,861 Stockholders' equity
Preferred stock
Common stock
116,310 116,310 86,000
Additional paid-in
capital
1,237,760 1,237,760 Retained earnings
2,736,054 2,963,267 1,450,630
4,090,124 4,317,337 1,536,630
Treasury stock
(1,165,684)
(1,165,684)
2,924,440 3,151,653 1,536,630
$ 20,564,112 $ 20,864,026 $ 2,681,703
*735 March 31, 1973
Adjustment
Dr. (Cr.)
Pro forma
ASSETS
Current assets
Cash
$ 789,191 Receivables
34,652 9,442,555 Inventories
10,820,836 Prepaid expenses
223,533 Total current
assets
34,652 21,276,115 Property, plant and
equipment (net)
35,001 1,337,979 Other assets
Goodwill (net)
652,846 Equity in affiliated
companies
(51,529)
77,694 Other
219,219 (51,529)
949,759 $ 18,124 $ 23,563,853 LIABILITIES
Current liabilities
Due to banks
$ 8,563,175 Current maturities
of long-term debt
584,892 Accounts payable
6,967,661 Other current
liabilities
(1,800)
(65,000)
927,136 Total current
liabilities
(66,800)
17,042,864 Deferred income taxes
$ 48,676 $ 16,625 Long-term debt
970,220 8% subordinated
debentures
845,861 Stockholders' equity
Preferred stock
Common stock
86,000 116,310 Additional paid-in
capital
(942,141)
2,179,901 Retained earnings
1,450,630 2,963,267 594,489 5,259,478 Treasury stock
(594,489)
(571,195)
4,688,283 $ (18,124)
$ 23,563,853 On the estate tax return petitioner valued *736 the Centennial stock owned by decedent at $ 98,381.22. This figure consisted of 75,248 shares valued at $ 92,370.60 (approximately $ 1.23 per share) and 6,055 shares [8] held in escrow valued at $ 6,010.62 per share (approximately 99 cents per share). In his notice of deficiency respondent valued 84,331 shares of Centennial stock at $ 5.25 per share for a total fair market value of $ 442,737.75. ULTIMATE FINDING OF FACT The fair market value of petitioner's Centennial stock was $ 2 per share. OPINION The issue for resolution is the August 19, 1973 fair market value of 84,331 shares of 10 cents par value voting common stock of Centennial Industries, Inc.
On April 27, 1973 decedent exchanged 43,000 shares, or one-half, of the common stock of Atlantic Can Company for the Centennial stock in a reorganization whereby Centennial *737 acquired all of the stock of Atlantic. Decedent acquired 75,248 shares of Centennial stock outright and was entitled to an additional 9,083 shares, which were held in an escrow account at the time of his death as security for any undisclosed liabilities of Atlantic. In connection with the reorganization, decedent executed an irrevocable proxy in favor of Smith, Centennial's president. The proxy was for a 2-year period and would expire if Smith ceased to be the president or chief executive officer of Centennial within the 2-year period. Due to Federal securities law, substantial restrictions on the sale of decedent's Centennial stock existed. Because the Centennial stock was an unregistered security its sale was subject to the provisions of Rule 144 of the Securities and Exchange Commission of the United States. In July 1973 Centennial filed a registration statement with the SEC the effect of which further limited decedent's ability to sell his Centennial stock. Section 2031(a)[9] provides that the value of the gross estate shall be determined by including the value at the time of *738 decedent's death of all property of the decedent. Section 20.2031-1(b), Estate Tax Regs., states that the fair market value of property "is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." The valuation of stock for tax purposes is purely a question of fact. Duncan Industries, Inc. v. Commissioner, 73 T.C. 266 (1979). We have stated that in determining the value of unlisted stocks, "actual sales made in reasonable amounts at arm's length, in the normal course of business within a reasonable time before or after the valuation date are the best criteria of market value." Duncan Industries, Inc. v. Commissioner, supra at 276. Neither party has presented evidence of such sale in the case subjudice. [10] Thus, both parties looked to other factors in their valuation of the Centennial *739 stock. Petitioner's expert witness, Eugene W. Zwillinger, in his original valuation report determined a price/earnings ratio for three corporations in the automotive parts business, three corporations in the food products business and one general merchandising corporation. All of the corporations were publicly owned. Zwillinger then reduced the average price/earnings ratio for each line of business for three factors: (1) stocks of smaller companies sell at lower price/earnings ratios than larger companies; (2) stocks of nondividend paying *740 companies sell at lower price/earnings ratios than dividend paying companies; and (3) stocks of undercapitalized companies sell at a lower price/earnings ratio than "better financed" companies Zwillinger reduced the average price/earnings ratios as follows: Average
Price/Earnings
Ratio
Before Reduction
After Reduction
Automotive
6.5
5.0
Food
5.7
4.2
General Merchandise
7.8
6.0
Zwillinger then weighed the reduced price/earnings ratios by the proportion of income Centennial derived from each line of business to arrive at a ratio of 4.6:1, if Centennial was a publicly owned company.Centennial's 1972 earnings was 76 cents per share, yielding a value of $ 3.50 per share (76 cents X 4.6), if Centennial were publicly owned. To the value of $ 3.50 per share, Zwillinger then applied a 60-percent discount to account for the size of the block of decedent's shares, the Rule 144 restrictions on the sale of such shares, and the irrevocable proxy given from decedent to Smith, resulting in a value of $ 1.40 per share. Zwillinger next discounted certain shares of the stock at a 10-percent annual rate to account for Rule 144 restrictions on the amount *741 of restricted securities which may be sold. [11] Zwillinger applied this discount as follows (based on Centennial's projected capitalization of 1,272,445 shares due to the proposed public offering, note 5, supra): Earliest Date
Discount
Value
For Sale
Shares
(10%/year)
Per Share
Total
4/28/75
12,724
$ 1.40
$ 17,813.60
10/28/75
12,724
5%
1.33
16,922.92
4/28/76
12,724
10%
1.26
16,032.24
10/28/76
12,724
15%
1.19
15,141.56
4/28/77
12,724
20%
1.12
14,250.88
10/28/77
11,628
25%
1.05
12,209.40
75,248
$ 92,370.60
*742 Zwillinger then determined that of the 9,083 shares held in escrow, two-thirds, or 6,055, would eventually be returned to decedent. Of these shares, 1,096 (12,724 less 11,628) could be sold on October 28, 1977, at the earliest, and thus subject to a 25-percent discount for a value of $ 1,150.80. The remainder, 4,959 shares, could be sold on April 28, 1978, and thus subject to a 30-percent discount for a value of $ 4,859.82 (4,959 X 98 cents per share). The total valuation of the escrowed stock was therefore $ 6,010.62 and the value of all stock reported on the estate return $ 98,381.22. In a supplemental report to his original valuation, Zwillinger looked at a number of other factors as well. Zwillinger believed that there was no history of success for Centennial in the successful initiation and integration of acquisitions, and that a generally "cloudy" business outlook prevailed. Zwillinger also looked at Centennial's earnings, dividend-paying ability and policy, the book value of its assets ($ 293 per share and $ 4.21 per share as of December 31, 1972 and April 30, 1973, respectively), goodwill, and financial condition. Zwillinger characterized Centennial's ratio of current *743 assets to current liabilities as "poor" and found "excessive dependence" upon short-term debt and a substantial increase in inventories. Additionally, Centennial had entered into a number of employment contracts for "substantial salaries" to the executives of acquired corporations. In his supplemental report Zwillinger determined a valuation of $ 2.34 per share based on an average earnings per share for the years 1968-1972 of 41 cents and a capitalization rate of 17-1/2 percent, which rate Zwillinger realized was "liberal in view of the strained financial position" of Centennial, but was approximately equal to the average of listed general food products companies (food products provided 77 percent of Centennial's 1972 income). Zwillinger then applied a 10-percent annual discount for the voting proxy to reach a value of $ 1.90 per share and to that figure a 30-percent blockage discount, for a final value of $ 1.33 per share.Zwillinger applied the blockage discount rather than the 10-percent annual discount for Rule 144 determined in his earlier report. Zwillinger also valued the escrowed shares at $ 1.33 per share on the assumption that any transfer of the other 75,248 shares *744 would include the escrow stock. Respondent's expert witness, John Carrick, valued all 84,331 shares at the same value, $ 3.50 per share. [12] Carrick reached this value in the following manner. First, Carrick determined price/earnings ratios for public corporations engaged in the three lines of Centennial's business. Carrick used five corporations for automobile parts, one corporation for food products and four corporations for general merchandising, with mean price/earnings ratios of 14.42 to 1, 9.44 to 1, and 9.49 to 1, respectively. Based on 1972 pro forma revenues Carrick weighted the ratios as follows: 40 percent to automobile parts, 30 percent to food products and 30 percent to general merchandising. The following table shows the "aggregate weights" Carrick arrived at for each category: Relative
Average
Aggregate
Category
Weight
Price/Earnings
Weight
Automobile Parts
4
14.42
57.68
Food Products
3
9.44
28.32
General Merchandising
3
9.49
28.47
Total
114.47
*745 Carrick then divided the aggregate weight of 114.47 by 10 (total relative weight) to arrive at a price/earnings ratio of 11.45. Applying this ratio to Centennial's 1972 earnings per share of 76 cents, Carrick arrived at a value of $ 8.70 per share, before discounts. Carrick then discounted the stock for the restrictions on public sale (35 percent), the voting proxy (15 percent) and the escrow agreement (10 percent) by a total of 60 percent, to arrive at a fair market value of $ 3.48 per share, which Carrick rounded up to $ 3.50 per share. There appears to be little, if any, dispute over the discount to be applied to the stock due to the securities law restrictions, voting proxy and escrow agreement. Carrick assigned a total discount of 60 percent for these factors. Zwillinger in his first report, discounted the nonescrowed stock approximately 65 percent (from $ 3.50 per share to $ 1.23 per share) and the escrowed stock approximately 72 percent (from $ 3.50 per share to 99 cents per share). In his supplemental report Zwillinger discounted all the stock, escrowed or not, approximately 43 percent (from $ 2.34 per share to $ 1.33 per share) based on his decision that a discount *746 for "blockage" was more appropriate than a discount for Rule 144's restrictions. Thus, Zwillinger's supplemental report reflects a much smaller discount than does Carrick. However, respondent has not urged that a lower than 60 percent discount be applied herein. We find that 60 percent is a fair and reasonable discount to account for the various restrictions upon and the blockage size of the stock. This leaves us to decide upon the fair market value of the stock without regard to Rule 144, the voting proxy and the escrow arrangement. Zwillinger's two reports found the unrestricted value to be $ 3.50 and $ 2.34 per share, while Carrick's report found an unrestricted value of $ 8.70 per share. Since both parties used a capitalization of earnings method, so shall we. Because of errors in each of these reports, we find the value of petitioner's Centennial stock, before discounts, to be $ 5 per share. Zwillinger's first report based its prediscount valuation on an estimated price/earnings ratio of 4.6:1 and 1972 earnings per share of 76 cents. Zwillinger's price/earnings ratios for Centennial's three business were weighted on Centennial's 1972 historical income, of which 77 percent *747 was derived from food products. However, the selection of 1972 historical income does not take into account the radical shift in emphasis which Centennial made through its acquisitions of 1972 and 1973. During that time, Centennial acquired four subsidiaries in the automotive replacement parts business and two subsidiaries in the general merchandising business. Centennial's 1972 income on a pro forma basis to reflect these acquisitions shows that income derived from food products declined to 47 percent of Centennial's total income, and was to be further deemphasized. The effect of Zwillinger's emphasis upon food product's price/earnings ratio tended to lower the overall hypothetical price/earnings ratio determined for Centennial because the food products price/earnings ratio of 4.2:1 was far below that of automotive replacement parts (5.0:1) and general merchandise (6.0:1). Thus, the 4.6:1 ratio was not a reliable indication because of the dramatic change in the nature of Centennial's business. Further, nothing in Zwillinger's original report demonstrates why such dramatic reductions were made to the prediscount ratios, see p. 15 supra. Zwillinger also utilized the earnings *748 per share figure of 76 cents for 1972. This amount included 88 cents per share for continuing operations and a loss of 12 cents per share for discontinued operations. [13] However, as we have noted, Centennial was altering the nature of its business and could not be expected to keep suffering losses from discontinued operations. Indeed, Centennial's unaudited consolidated income statement for January through March of 1973 reflects earnings of 29 cents per share and no loss from discontinued operations. Zwillinger's supplemental report capitalizes Centennial's average earnings per share of 41 cents for 1968-1972 at a rate of 17-1/2 percent to arrive at a prediscount valuation of $ 2.34 per share. We believe that both factors selected by Zwillinger are inaccurate. The 5-year average earnings per share of 41 cents reflects the "old" Centennial, a corporation heavily involved in food products and with very little involvement in the automobile replacement parts industry. While it is true that a corporation's average earnings over a substantial period will more *749 adequately reflect the corporation's earning power than its earnings during a time of acquisitions of subsidiaries, the 41 cents figure does not reflect Centennial's new corporate emphasis as of August of 1973. Furthermore, the 17-1/2 percent capitalization rate was derived from general food products corporations because of the historical predominance of that area in Centennial's past. [14] We cannot accept that rate of return because (1) the report contains no information as to the capitalization rate of general food products corporation and (2) Centennial was quickly moving away from the food products business and into other businesses. Thsu, we must reject the supplemental report's value of $ 2.34 per share. *750 Carrick's valuation was also based on an estimated price/earnings ratio of Centennial, however he determined the ratio to be 11.45:1. Like Zwillinger's first report, Carrick used Centennial's 1972 earnings per share of 76 cents. Carrick found average ratios of 14.42 (automobile replacement parts), 9.44 (food poducts), and 9.49 (general merchandising). We question, however, the accuracy of these averages because within the automotive replacement parts and general merchandising area the price/earnings ratios of the selected corporations vary widely. [15] In the automotive replacement parts category the ratios range from 6.80:1 to 24.73:1 [16] and in the general merchandising category from 4.13:1 to 20.91:1. [17] Carrick only selected corporations based upon the line of business engaged in and not upon similarity to Centennial with regard to other factors (such as volume of sales and general financial condition).
*751 From the various valuations we find that an earnings per share figure of 80 cents is reasonable. This number is adjusted upwards from 76 cents per share (the figure used by both petitioner and respondent) to account for the completion of Centennial's discontinuance of certain of its operations. At the time of decedent's death Centennial had made and largely implemented the decision to move away from the food products business and concentrate on automotive replacement parts and general merchandising. No longer could Centennial be expected to incur such heavy losses at 12 cents per share from discontinued operations. We also find that a price/earnings ratio of 6.25:1 to be reasonable for Centennial. While the theoretical ratio developed by respondent greatly exceeded this figure, that ratio may have been greatly discorted by the selection of corporations with unrealistic ratios. Petitioner's ratio of 4.6, on the other hand, was adjusted downward to account for various factors [18] and was further decreased by Zwillinger's reliance on corporations engaged in food products. Had petitioner weighted the categories in the correct manner, which respondent did, and made no adjustments, *752 petitioner would have obtained a price/earnings ratio of 6.65:1. [19]
Centennial's financial position was not particularly strong. As petitioner recognized, Centennial was quite dependent upon short-term debt. Indeed, Centennial's "current ratio" (current assets/current *753 liabilities) was 1.2:1 as of December 31, 1972. Respondent suggests that the $ 10 per share value used in the escrow agreement and the Form S-1 is relevant to the question herein. We do not attach much importance to the values in those documents. The $ 10 value in the escrow agreement was utilized to determine the number of shares which decedent and Fuller may be required to return to Centennial. The higher the value assigned to the escrowed shares, the fewer shares that would be returned and the lesser the decrease in decedent's and Fuller's stock ownership of Centennial. In all probability the $ 10 value was reached to induce decedent and Fuller to enter into the reorganization and not as a true indication of the stock's value. The value on Centennial's Form S-1 was merely a proposed maximum offering price estimated solely for the purpose of calculating Centennial's registration fee. We find that the fair market value of petitioner's Centennial stock to be $ 2 per share, based upon an unrestricted fair market value of $ 5 per share with a 60-percent discount for securities law restrictions, an irrevocable 2-year voting proxy, an escrow agreement and blockage. *754 Decision will be entered under Rule 155. Footnotes
1. From the exhibits submitted into evidence herein it is apparent that the Newark District Director, upon receipt of the estate tax return, forwarded it to the Internal Revenue Service Center in Holtsville, New York.↩
2. Although the parties have stipulated only to Atlantic's ownership interest in one other corporation, Atlantic owned 50 percent and 25 percent of two other companies as well.↩
3. Although Joan Little has testified that decedent, Fuller and Colcord were the only owners of Atlantic, it appears from the evidence that others also owned shares of Atlantic stock.↩
4. Colcord received a net distribution in redemption of $ 510,216, consisting of land and buildings with a book value of $ 713,958 (and a mortgage of $ 353,742 which Colcord assumed) and cash of $ 150,000.↩
5. The 510,000 shares included 30,000 shares issuable upon the exercise of warrants to be issued to the representatives of the underwriters of the public offering and 30,000 shares which may have become issuable pursuant to other provisions of such warrants. Of the 450,000 shares available to the public, 300,000 shares were to be offered for Centennial's account and 150,000 shares for the accounts of certain Centennial shareholders.↩
6. Although the parties dispute whether decedent also sought loans from other sources, it appears from the record that decedent approached only Centennial, after deciding that he would be unable to obtain a loan from a bank using the Centennial stock as collateral.↩
7. The years 1968 and 1969 were not covered by the report of independent certified public accountants included in Centennial's preliminary prospectus filed with the SEC. The 3-month periods ending March 31, 1972 and March 31, 1973 were unaudited.↩
8. While petitioner only included 81,303 shares of Centennial stock in the gross estate, the parties have stipulated that decedent's gross estate included 84,331 shares of Centennial stock. This figure consists of 75,248 held outright by decedent and 9,083 held subject to the escrow agreement. The correct number of shares is the stipulated figure.↩
9. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
10. Petitioner's expert witness, Eugene M. Zwillinger, in his valuation report, noted several fairly contemporaneous transactions involving Centennial stock. Zwillinger's report concluded that none of these transactions would be relevant in determining the fair market value of petitioners' stock. Zwillinger's report does not contain the facts and circumstances surrounding such transactions and because no other evidence was introduced regarding those transactions we cannot find that they are relevant herein.
Respondent's expert witness, John Carrick, also noted these transactions in his valuation report, and drew no conclusions therefrom.↩
11. Rule 144 provides a manner in which securities may be sold without being registered by the SEC. Failure to meet its conditions would require the seller to register the securities before they may be sold without violation of the Securities Act of 1933. Rule 144 limits the sale of restricted securities which may be sold by each individual to 1 percent of the outstanding shares of the class being sold, as shown by the most recent report or statement published by the issuer, every 6 months. In addition, Rule 144↩ also required the holder of such securities to have held them for at least 2 years prior to the sale. Zwillinger found it highly unlikely that decedent's stook would ever be registered.
12. Respondent conceded at trial that the per share value of the stock did not exceed $ 3.50. Respondent's notice of deficiency valued the stock at $ 5.25 per share.↩
13. Zwillinger's report notes that on a pro forma basis Centennial's earnings for 1972 were 99 cents per share.↩
14. By capitalizing a fixed amount of earnings per share at a higher rate the value of the stock will be reduced from what it would have been had a lower capitalization rate been used. For example, if a corporation earns $ 1 per share, a capitalization rate (or "return of capital") of 10 percent will yield a value of $ 10 per share. However, if the same earnings of $ 1 per share are capitalized at a 20-percent rate, the value of the stock will only be $ 5 per share. The supplemental report recognized that 17-1/2 percent was a "liberal capitalization rate."↩
15. Carrick selected only one corporation in the food products area.↩
16. The actual ratios of the five selected corporations in this category are 6.80:1, 7.04:1, 15.54:1, 17.99:1 and 24.73:1. ↩
17. The four corporations in this category had ratios of 4.13:1, 4.43:1, 8.48:1, and 20.91:1.↩
18. For example, Zwillinger stated that the ratios of smaller companies are lower than those of larger companies and that the ratios of nondividend paying companies are lower than those of dividend paying companies. However, Zwillinger lists one corporation with a 40 cents dividend and volume of $ 128 million and another corporation which paid no dividend and had a volume of $ 19 million. Both corporations were engaged in the food products business and, despite these differences, had price/earnings ratios of 4.9:1 and 4.8:1, respectively. This small difference in price/earnings ratio hardly justifies the large downward adjustments that Zwillinger in fact made. ↩
19. Preadjustment
Weighted
Category
Ratio
Weight
Ratio
Automotive Replacement Parts
6.5
4
26.0
Food Products
7.8
3
17.1
General Merchandising
7.8
3
23.4
Total
66.5
One-tenth of 66.5 equals 6.65.↩