ROYCE C. McDOUGAL, M.D., INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent McDougal v. Commissioner
Docket Nos. 2852-83, 2853-83, 2854-83.
United States Tax Court
T.C. Memo 1985-64; 1985 Tax Ct. Memo LEXIS 570; 49 T.C.M. (CCH) 731; T.C.M. (RIA) 85064; February 12, 1985. James F. Davis and Keith T. Childers, for the petitioners. Juandell D. Glass and Leroy D. Boyer, for the respondent. COHEN
*2 MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in and additions to Federal income tax in these consolidated cases as follows: Petitioner
Taxable
Additions to Tax
Docket No.
Year
Deficiency
Sec. 6651(a)
Sec. 6653(a) [2]
Royce C. McDougal,
9-30-78
$949.68
M.D., Inc.
9-30-79
607.37
$151.84
2852-83
9-30-80
960.54
Estate of Thomas
1977
4,481.00
$224.05
Archie
Trow, Deceased, and
1978
4,208.24
210.41
Elaine Trow
2853-83
Royce C. McDougal
1977
6,080.82
304.04
and Martha T.
1978
10,979.63
548.98
McDougal
1979
7,882.00
394.01
2854-83
*572 After concessions, the issues remaining for decision are (1) what amounts relating to the use of a vehicle owned by Royce C. McDougal, M.D., Inc. and operated by petitioner Royce C. McDougal should be allowed as deductions to the corporate petitioner and what amounts should be included in the McDougal's gross income as constructive dividends; and (2) the amounts allowable to petitioners in each of the taxable years as deductions for contributions of shares of stock in a closely held corporation to a charitable foundation. *733 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner corporation, R.C. McDougal M.D., Inc., a/k/a/Royce C. McDougal, M.D., Inc. (McDougal, Inc.), was an Oklahoma corporation having its principal office in Holdenville, Oklahoma, during the years in issue and at the time the petitions in these consolidated cases were filed. At all times material herein McDougal, Inc. *573 was a professional service corporation which rendered medical services. McDougal, Inc. was wholly-owned by petitioner Royce C. McDougal (McDougal), who served as president of the corporation. McDougal and his wife, Martha T. McDougal, and T.A. Trow (Trow) and his wife, Elaine Trow, resided in Holdenville, Oklahoma, during the years in issue and at the time their petitions were filed herein. At all times material herein McDougal was a physician practicing medicine as an employee of McDougal, Inc., and T. A.. Trow was a physician practicing medicine as an employee of his wholly-owned professional service corporation, T.A. Trow, Inc. (Trow, Inc.) T. A. Trow, also known as Thomas Archie Trow, died during the pendency of these proceedings on June 23, 1983. The Estate of Thomas Archie Trow, deceased, was substituted as a party petitioner on July 5, 1984. *4 (1) Personal Use of Vehicles
During the years in issue McDougal, Inc. provided McDougal with a leased Ford pickup truck for his business and personal use. The corporation leased a new pickup truck every 2 years and paid all expenses relating to the operation and maintenance of the vehicle, including lease payments, *574 insurance, license fees, repairs, gasoline and oil. The vehicles were driven between 25,000 and 30,000 miles before being returned to the leasing company at the end of a 2-year period. Although the vehicle was used primarily for corporate business, McDougal also used it to commute between his home and clinic (1.6 miles round trip). His personal use of the vehicle also included travel between Holdenville and Oklahoma City (170 miles round trip) in connection with his work on the legislative council of the Oklahoma Medical Association (once a week during legislative sessions) and his work as a preceptor for a medical school (four to five times each year). McDougal also used the vehicle on local fishing and hunting trips. During the fishing season from March to October, McDougal went fishing an average of twice a week (30 miles round trip per week). He went hunting approximately five or six times a year (30 miles round trip). On its returns for the years ended September 30, 1978, September 30, 1979, and September 30, 1980, respectively, McDougal, Inc. claimed the following amounts as automobile and travel expenses: $4,090.45, $4,438.30, and $5,340.53 *5 In his statutory *575 notice of deficiency in docket No. 2852-83, respondent disallowed in entirety the claimed deductions of McDougal, Inc. for the fiscal years ended September 30, 1978, and September 30, 1980, because it was not established that the amounts represented ordinary and necessary business expenses or were expended for the purpose designated. In the statutory notice in docket No. 2854-83, respondent determined that payments made by McDougal, Inc. during the taxable years 1977, 1978, and 1979, for the operation and maintenance of the company-owned pickup trucks were for the McDougal's personal benefit and constituted constructive dividends for those years in amounts of $889.76, $3,954.02, and $3,948.91, respectively. Respondent now concedes that 90 percent of the expenses attributable to the pickup trucks were for the business use of McDougal, Inc., and 10 percent of those expenses were for the personal benefit of the McDougals. (2) Charitable Contribution Deductions
On their individual income tax returns for the years in issue, petitioners McDougal and Trow claimed charitable contribution deductions with respect to donations in 1977 and 1978 of shares of Physicians and Surgeons Clinic, *576 Incorporated (PSC) to The Care's Foundation (Care's), a private foundation within the meaning of section 170(b)(1)(D) (now section 170(b)(1)(E)). *6 At the time of incorporation in 1961, McDougal and Trow each owned one-fifth of the outstanding capital stock of PSC, an Oklahoma professional corporation. The corporation's status as a professional corporation was changed to that of a business corporation by amended articles of incorporation dated September 16, 1976. At the beginning of 1977, McDougal and Trow each owned 50 percent (10 shares) of the corporation's outstanding capital stock. At all times pertinent to this proceeding PSC maintained its books and records and filed its Federal income tax returns on a cash basis of accounting. Because McDougal and Trow wished to be relieved of many of the problems and responsibilities of running a business and hoped to increase the efficiency of the clinic, they arranged with William T. Daniel (Daniel) for an organization known as Medical Management Group (MMG) to take over the operation and management of PSC in 1976 on a trial basis for 1 year. Under the initial arrangement with MMG, McDougal and Trow performed medical services *577 for PSC, and each received compensation equal to 50 percent of his collectible billing. The doctors were pleased with their arrangement with MMG and agreed to continue the arrangement for a 3-year period in exchange for an increased percentage of collectible billing. Pursuant to the new arrangement, McDougal and Trow entered into *7 identical agreements, dated August 25, 1977, which referred to PSC as "First Party" and each doctor's professional corporation as "Second Party" and provided in pertinent part as follows: 1. Second Party shall perform medical services on contract basis for First Party and Second Party shall receive as compensation therefore the following amounts: Fifty-five percent (55%) of collectible billing, payable monthly. 2. First Party shall furnish to Second Party office space, furniture, supplies, nurses and equipment necessary for Second Party to perform the services under this contract. 3. Second Party shall furnish those things necessary for personal use not related to practice income such as personal long distance phone calls, etc. 4. The term of this Contract shall be for a period of ten (10) years beginning the date of this agreement. *578 This Contract shall not be terminated by either party. * * * 6. All work performed by Second Party under this Contract and Agreement shall be considered work performed for and on behalf of First Party. All clients of First Party shall at all times remain clients of First Party. All files, working papers, and any other material prepared by Second Party in connection with First Party clients shall remain the property of First Party. All account receivables due and owing as a result of work performed by Second Party for First Party under the terms of this contract shall remain and at all times be the property of First Party. All contracts, monthly billings and retainer agreements entered into as a result of this agreement shall remain the property of First Party. 7. * * * It is therefore agreed between the parties that patients of First Party shall at all times remain patients of First Party. All files, working papers, and any other materials prepared by Second Party in connection with First Party's patients shall remain the property of First Party. 8. For a period of two (2) years from the date of termination of this agreement, whether by mutual consent or by either *579 party hereto, and whether by wrongful discharge or otherwise, Second Party shall not directly or indirectly, either as an individual on his own account, or as partner or joint venture, or as an employee, agent, or assistant for any person, association, corporation, or as an officer, director, or stockholder of a corporation or otherwise; *8 (a) canvas, solicit, or accept any business from any present or past client of First Party. (b) directly or indirectly request or advise any present or future clients of First Party to withdraw, curtail, or cancel his business with First Party. (c) directly or indirectly disclose to any other person, firm, or corporation, names of past, present or future clients of First Party. (d) directly or indirectly induce or attempt to influence any employee of the First Party to terminate his employment. (e) directly or indirectly engage in the business of rendering medical services or related services within the County of Hughes, Oklahoma. * * * 9. This Contract will be irrevocable unless any employee of Second Party performing services under this agreement ceases to be a professional in good standing with the peers in his profession. *580 An addendum to the 1977 agreement defined "collectible billing" as "total gross billing less all welfare and medicare/welfare assigned billing which will be paid on the percent formula upon receipt of payment from the state agency." The arrangement under the 1977 agreement continued until petitioners terminated their association with MMG on June 6, 1979. Expenses of PSC, other than doctors' fees, exceeded 45 percent of income for the fiscal years ended June 30, 1974, June 30, 1975, and June 30, 1977. At all times material herein, PSC owned all the tangible personal property located in the clinic and, subject to the rights of patients, all medical records and reports used by *9 McDougal, Inc. and Trow, Inc. in connection with the practice of medicine. The office space furnished under the employment agreements was leased by PSC, at its expense, from MTM Corporation (MTM), which was owned equally by McDougal and Trow. PSC paid no dividends prior to or during the years in issue. The balance sheet (Schedule L) of PSC's corporate income tax return for the year ended June 30, 1978, indicated current liabilities of $9,840.28 in excess of current assets. Pursuant to a plan *581 devised by Daniel to further relieve the doctors from their responsibilities in connection with the clinic and to save taxes, McDougal and Trow donated shares of PSC to Care's in 1977 and 1978. McDougal and Trow pledged all of their shares in PSC (20 shares) and all of their shares in MTM to Care's pursuant to a "Pledge Agreement" dated August 25, 1977. Under the terms of the Pledge Agreement, McDougal and Trow agreed to deposit all their shares in PSC and MTM with attorney Max Moulton as escrow agent, instructed him to transfer to Care's stock in the corporations equal to a minimum value of $10,000 per year each, and authorized additional transfers to Care's within the agent's sole discretion. Under the Agreement, the escrow agent had the right to vote the shares held in the escrow account. Upon the death of either doctor, his shares held by the escrow agent would be immediately transferred to Care's. Stock assignments dated December 10, 1977, indicated transfers to Care's by McDougal and Trow of 2 shares and 1.4 *10 shares, respectively. Additional transfers of .45 shares each were the subject of stock assignments dated December 10, 1978. [3]
*582 Under Daniel's plan, Care's would arrange to have the PSC corporate assets appraised "as high as possible in an effort to secure the most optimistic appraisal. This would give each [doctor] a 30% of adjusted gross income tax deduction personally each year." Daniel advised McDougal and Trow: In the event that you hesitate in making your decision, you might let me warn you that in my opinion MTM is a holding company which has very serious tax consequences. In other words, impossible. I recommend that we have a meeting immediately to strive to eliminate the holding company problem by paying out all the earnings of reducing the income to the corporation from P&S Clinic so that there will not be a profit. Should you decide to go ahead with this option you need to sign the stock certificates for MTM and P&S Clinic on the back which will make the transfer, then send them back with Bob McLauchlin. Your accountants will work with you in taking the deduction to the best advantage. This, in my opinion, is a way for you to get rid of the responsibility, have Uncle Sam give you back a lot of money and keep the control where you can continue somewhat as you normally have in management *583 with MMG coordinating and continuing with its operational contract. On their 1977, 1978, and 1979 returns, prepared by Walter S. Hammert, a certified public accountant, the McDougals claimed deductions of $14,751.04, $19,282.39, and $15,846.05, *11 respectively, for donations of 1 share of PSC in 1977 and 1.45 shares in 1978. These amounts were based on a value of $22,500 per share and reflect petitioners' limitation of their claimed charitable contribution deductions to 30 percent of adjusted gross income and their carryovers of the unused portions of these deductions to their 1978 and 1979 returns. The Trows claimed charitable contributions on their 1977 and 1978 returns with respect to their stock donations to Care's in amounts of $15,500 and $10,125, respectively. Respondent's valuation engineer, Fred M. Selensky (Selensky), determined the fair market value of 100 percent of the PSC stock to be not more than $500, or $25 per share. In his notices of deficiency, respondent determined that it was not established that the PSC stock contributed by petitioners had a fair market value in excess of $25 per share. Respondent allowed the McDougals $25 for the 1977 contribution *584 and $36.25 for that in 1978, allowed no carryover deductions, and increased their taxable income by $14,726.04, $19,246.14, and $15,846.05, for 1977, 1978, and 1979, respectively. Respondent allowed the Trows $35 for the 1977 contribution and $11.25 for that in 1978, and increased their taxable income by $15,465 and $10,113.75 for 1977 and 1978, respectively. *12 ULTIMATE FINDINGS OF FACT (1) Petitioner McDougal used the company-owned vehicle 90 percent of the time on company business of McDougal, Inc. and 10 percent for personal purposes. (2) The fair market value of the PSC stock donated by petitioners to Care's in 1977 and 1978 was no more than $25 per share. OPINION (1) Personal Use of Vehicles
At trial petitioners admitted that some personal use was made of the pickup trucks leased for them by McDougal, Inc., but they claimed for the first time that only 90 percent of the total expenses incurred were actually taken as deductions on the corporate returns. Petitioners failed to introduce any evidence to substantiate this claim, and we therefore reject it. See Rule 142(a), Tax Court Rules of Practice and Procedure. The testimony of McDougal supports our *585 finding that (at least) 10 percent of the use of the vehicles was personal to him. A corporation is not entitled to deductions related to a stockholder's use of corporate property for personal purposes not proximately related to corporate business, and the fair "rental" value of such property is includable in the stockholder's income. Commissioner v. Riss,374 F.2d 161, 166-167, 170 (8th Cir. 1967), affg. a Memorandum Opinion of this Court; Challenge Manufacturing *13 Co. v. Commissioner,37 T.C. 650, 659, 663 (1962); Rodgers Dairy Co. v. Commissioner,14 T.C. 66, 73-74 (1950). The personal use of corporate property by a shareholder is a constructive dividend to the shareholder in amount equal to the fair value of the benefits conferred. See Nicholls, North, Buse Co. v. Commissioner,56 T.C. 1225, 1238 (1971); Challenge Manufacturing Co. v. Commissioner,37 T.C. at 663. Sections 301(c)(1) and 316 provide *586 that to the extent of earnings and profits such distributions will be dividends to the shareholder. No evidence or argument was presented regarding the earnings and profits of McDougal, Inc.Thus we conclude that petitioners have not met their burden of proving that McDougal, Inc. lacked sufficient earnings and profits to cover the amounts in question. Rule 142(a), Tax Court Rules of Practice and Procedure. Accordingly, such distributions, to the extent disallowed as expenses of McDougal, Inc., represented dividend income to the McDougals individually. (2) Charitable Contribution Deductions
We must determine the fair market value of the PSC stock at the times of the contributions to the Care's Foundation in 1977 and 1978. Although petitioners claimed charitable contribution deductions on their 1977 and 1978 returns based on a value of $22,500 per share, petitioners now contend the stock was worth $15,400 per share at the time of each contribution. Respondent *14 contends the stock was worth only $25 per share at the time of each contribution. Section 170(a)(1) allows a deduction *587 (subject to certain limitations not relevant here) for charitable contributions made during the taxable year. The parties agree that Care's qualifies as a private foundation under section 170(b)(1)(D) (now section 170(b)(1)(E)). Section 1.170A-1(c)(1), Income Tax Regs., generally provides that if a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Section 1.170A-1(c)(2), Income Tax Regs.
Respondent's determination in the notice of deficiency is presumptively correct. Petitioners have the burden of proving that the valuation of the PSC stock should be higher than the $25 per share determined in the statutory notices. Welch v. Helvering,290 U.S. 111 (1933); Rule *588 142(a), Tax Court Rules of Practice and Procedure.
Where the property contributed is stock in a closely held corporation, such value is a pure question of fact. See Hicks v. United States,486 F.2d 325, 328 (10th Cir. 1973); Hamm v. Commissioner,325 F.2d 934, 938 (8th Cir. 1963), affg. a *15 Memorandum Opinion of this Court; Duncan Industries, Inc. v. Commissioner,73 T.C. 266, 276 (1979). In determining the value of unlisted stocks, actual sales made in reasonable amounts at arm's length, in the normal course of business within a reasonable time before or after the valuation date, are the best criteria of market value. Fitts' Estate v. Commissioner,237 F.2d 729 (8th Cir. 1956), affg. a Memorandum Opinion of this Court; Duncan Industries, Inc. v. Commissioner,73 T.C. at 276. Petitioners made no effort to comport with this standard. Although McDougal testified that PSC repurchased the stock of two *589 physicians who left the clinic sometime during the fiscal years 1975, 1976, or 1977, no evidence was introduced regarding these transactions. Petitioners' expert witness, Walter S. Hammert, testified that he did not consider the repurchases in arriving at his valuation of the PSC stock. We infer that evidence of those transactions would be unfavorable to petitioners' position. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Although opinion evidence is admissible and relevant on the question of value, we must weigh such evidence in light of the demonstrated qualifications of the expert and all other evidence of value. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. We may find the evidence of valuation by one of the parties sufficiently more *16 convincing than that of the other party. Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980). Petitioners rely on Hammert's testimony *590 to support the claimed deductions. Hammert, a certified public accountant, admitted that he had never before performed a fair market valuation for stock of a closely-held corporation. Respondent relies on the valuation report and expert testimony of his valuation engineer, Selensky, an agent experienced in evaluating stock of closely-held corporations. Hammert testified that in his opinion each share of PSC stock had a value at the time of each contribution of $15,400 for liquidation purposes and from $18,500 to $20,500 as a going concern. He testified that he arrived at his valuation by making certain adjustments to the balance sheets (Schedule L) of the PSC Federal income tax returns for the fiscal years 1977 and 1978. Hammert attributed substantial value to accounts receivable, PSC's lease on the office space owned by MTM, and PSC's machinery, equipment, furniture, and fixtures. No books or records of the corporation, no copy of the lease, nor any other evidence was introduced to validate the adjustments. No written valuation report was introduced to support Hammert's appraisal. Hammert stated that he included $192,000 in accounts receivable for 1977 and $200,577 for 1978. *591 Hammert's approach is inherently flawed, however, in view of the effect of the employment agreements on the receivables. The agreements in effect at the times of the contributions provided for payment to *17 each physician of 55 percent of his collectible billing, with adjustments for welfare and medicare/welfare assigned billing. The evidence reveals that after payment of expenses and the percentage due the physicians under the employment agreements, there was no profit available for distribution to stockholders. Hammert attributed $95,000 for 1977 and $102,000 for 1978 to PSC's lease. Because neither the lease nor the subleases he assumed are part of the record, Hammert's testimony as to the value of the lease is purely speculative. We seriously doubt that an expert in the field or a prospective purchaser of stock would reasonably rely on such conjecture. See Rule 703, Federal Rules of Evidence. Moreover, the fact that McDougal and Trow were effectively both lessee and lessor by virtue of their ownership of MTM and could have changed the contract at any time casts doubt on any attribution of value to the lease. Hammert concluded that the fair value of PSC's machinery, *592 equipment, furniture, and fixtures on June 30, 1977 was $16,900. Hammert testified that this figure was composed of the undepreciated basis of the personal property shown on the corporation's 1977 income tax return balance sheet, plus 30 percent of the initial cost of those items. Again, the record contains no evidentiary support for Hammert's conclusion and no verification of the correctness of his method. Respondent's expert Selensky relied primarily on the overall effect of the physicians' employment agreements in reaching his conclusion that the total value of the PSC stock was worth no *18 more than $500. Because the 1977 agreements did not prevent the doctors from leaving the clinic at any time -- by moving to another community or by retiring from medical practice -- and there was no anticipated income available to potential stockholders after payment of expenses, Selensky concluded that there was no "future benefit," i.e., no expectation of return, from ownership of the PSC stock. There are many unexplained gaps in the evidence, and those gaps are to the disadvantage of petitioners, who bear the burden of proof. See also Wichita Terminal Elevator Co. v. Commissioner,supra. *593 After weighing all the facts and circumstances revealed by the entire record and considering the opinions of the expert witnesses, in light of their qualifications and methods of valuation, we are convinced that respondent's valuation is the most reasonable. Petitioners have certainly failed to establish any value in excess of $25 per share. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith. Estate of Thomas Archie Trow, Deceased, Hugh Edward Brinson, Executor, and Elaine Trow, docket No. 2853-83; Royce C. McDougal and Martha T. McDougal, docket No. 2854-83.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
3. The record is ambiguous as to when and in what amounts the shares of PSC were transferred by McDougal. The parties stipulated that he donated 1 share in 1977 and 1.45 shares in 1978. The PSC stockholder ledger for McDougal indicated a transfer of 2 shares on December 10, 1977, and .45 share on December 10, 1978. The McDougal's 1977 Form 1040 indicated a contribution of 1 share in 1977. Their 1978 return indicated a contribution of 1 share on October 3, 1978, and .45 share on December 10, 1978. Correspondence from petitioners' attorney, Moulton, contains conflicting statements as to when and in what amounts the total of 2.45 shares was transferred by McDougal.↩